UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PM SERVICES COMPANY,

    Plaintiff/Counter-Defendant,

     v.

ODOI ASSOCIATES, INC.,

    Defendant,

     and

WILLIAM O'SHEA,

    Defendant/Counter-Claimant.

Civil Action No. 03-1810  (CKK)

**MEMORANDUM OPINION**
(January 4, 2006)

      Plaintiff PM Services Company ("PM Services"), a Florida-based company in the business of providing operations and maintenance ("O&M") services for commercial and federal buildings in the District of Columbia, Virginia, and other locations, brings this action alleging (1) a breach of the duty of loyalty against its former employee, Defendant William O'Shea ("O'Shea"), and (2) tortious interference with advantageous relationships and contracts against Defendants O'Shea and Odoi Associates, Inc. ("OAI"), in the events leading up to the General Services Administration's ("GSA") decision to award the O&M contract for the Cohen & Switzer buildings to OAI – and not PM Services – in 2003.  *See* Compl. ¶¶ 33-36 (Count I - Breach of Duty of Loyalty), ¶¶ 37-42 (Count II - Tortious Interference).  O'Shea and OAI dispute PM Services' chronicle of the relevant events, emphasizing the dearth of evidence supporting PM Services' "vague, broad-stroke allegations" and contending instead that PM Services' claims arise out of nothing more than a desire for an illegal restraint on trade, a refusal to accept its own lackluster performance, and the painful

clarity of wistful hindsight.  *See* Defs.' Reply at 1.  Additionally, O'Shea also asserts two claims

against PM Services, contending that (1) PM Services contravened D.C. Code § 32-1303 when it

failed, without justification or excuse, to pay his base and bonus wages during the leave period

immediately prior to his resignation from its employ; and (2) PM Services violated his pension rights

when it failed to fulfill its obligations as a Participating Employer of CPF by failing to make

payments and/or contributions due on his behalf.  *See* O'Shea's Answer & Countercl. ¶¶ 21-23

(Count I - Violation of § 32-1303 of the D.C. Code), ¶¶ 24-27 (Violation of Pension Rights).

The Court currently has a flurry of motions before it, including:  PM Services' Motion for

Summary Judgment, Defendants' Opposition, Defendants' Motion for Summary Judgment, PM

Services' Opposition, and Defendants' Reply.  Upon a searching examination of the parties' motions

and filings, all attached exhibits, the relevant case law, and the entire record herein, the Court shall

deny both Plaintiff PM Services' Motion for Summary Judgment and Defendants' corresponding

Motion for Summary Judgment in their respective entireties.

## I: BACKGROUND

In order to lend greater clarity and insight into its legal analysis, the Court shall carefully

scrutinize the record adduced in this case.  In its discussion of the background facts, the Court shall

look at:  (1) the background of the litigants; (2) the history of PM Services' O&M contract for the

Cohen & Switzer buildings; (3) improvements following PM Services' decision to hire O'Shea; (4)

the expansion of PM Services and the promotion of O'Shea through its ranks; (5) the development

of problems between PM Services and O'Shea during the Spring of 2003; (6) the performance issues

with PM Services' Cohen & Switzer contract that crept up in the Spring of 2003; (7) O'Shea's

attempt to seek employment elsewhere, and the commencement of his discussions with OAI in May

2003; (8) the intensification of O'Shea's contact with OAI as May 2003 progressed; (9) O'Shea's

June 2003 resignation from PM Services and agreement to join OAI; (10) the ultimate award of the

2003 Cohen & Switzer O&M contract to OAI, and not PM Services, in the Summer of 2003; and

(11) other conduct at issue, such as O'Shea's and OAI's alleged recruitment of PM Services

employees, allegations that O'Shea disparaged PM Services, and assertions that O'Shea improperly

retained PM Services' property following his resignation.

### A.    *Background of the Litigants*

Plaintiff PM Services is a Florida corporation with its principal offices located in St.

Petersburg, Florida, although it regularly conducts business in the District of Columbia as a

commercial O&M service provider.  Compl. ¶¶ 2, 10; Defs.' Stmt. of Mat. Facts Not in Dispute

("Defs.' Stmt.") ¶ 1; Pl.'s Response to Defs.' Stmt. ("Pl.'s Resp.") ¶ 1.[1]  The services that PM

---

[1] The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)).  As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.  The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

Contrary to Local Civil Rule 56.1, Plaintiff, in responding to Defendants' Statement of Material Facts Not in Dispute, has not provided "a separate *concise* statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  LCvR 56.1 (emphasis added).  Rather than admitting, denying, or denying-in-part/ admitting-in-part each statement set out by Defendants in corresponding numbered paragraphs and supporting each response through citations to the record, as required by Local Civil Rule 56.1 and this Court's July 7, 2004 Scheduling Order, Plaintiff (1) regurgitates many of the allegations made in its own Statement of Material Facts when responding to Defendants' specific statements, despite a lack of connection between Defendants' factual assertion and Plaintiff's response; (2) makes frequent cross-references between its responses; (3) exhibits a glaring tendency to intersperse legal argument with its factual responses; (4) fails to provide record citations for numerous assertions; and (5) where record citations are provided, they often either bear no connection to the facts asserted or conclusion drawn or pertain so marginally that one must radically extrapolate from the record even to approach the conclusion that Plaintiff seeks to draw.

The Court finds that this deviation from the mandate of the Local Civil Rule undermines the purpose of the Rule which is to assist the Court in quickly determining which facts are actually in dispute.  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153

Services provides under its various O&M contracts include the planning, programming,

administration, management, and execution necessary to provide preventative maintenance, repairs,

operations, and service calls, including routine, urgent, and emergency responses for facilities

covered by its contracts.  Pl.'s Stmt. of Mat. Facts Not in Dispute ("Pl.'s Stmt.") ¶ 2; Defs.'

Response to Pl.'s Stmt. ("Defs.' Resp.") ¶ 2.  Having been engaged in business since 1986, a

substantial portion – if not all – of PM Services' revenues come from contracts to provide O&M

services to federally-owned buildings, whose contracts are awarded through the GSA.  Defs.' Stmt. ¶

1; Pl.'s Stmt. ¶ 1.  PM Services has been awarded GSA O&M contracts through competitive bid

processes and has been "sole sourced" GSA contracts as a Small Business Administration ("SBA")

---

(D.C. Cir. 1996) ("[R]epeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes of a [Rule 56.1] statement."); *Robertson v. American Airlines*, 239 F. Supp. 2d 5 (D.D.C. 2002) (striking defendant's motion for summary judgment for noncompliance with Local Rule 7 and 56.1 because the "statement of material facts not in genuine dispute" included no citations to the record and improperly mixed factual allegations with argument); *Gibson v. Office of the Architect of the Capitol*, Civ. No. 00-2424(CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002) ("Plaintiff's Statement is almost completely unhelpful to the Court as its provisions rarely address the facts outlined in Defendant's Statement, instead describing in lengthy detail the 'contextual and structural background' surrounding Defendant's stated facts.  Such excess, unresponsive verbiage is a clear violation of both the letter and the spirit of Local Rule 56.1."); *see also Koken v. Auburn Mfg., Inc.*, Civ. No. 02-83B-C, 2004 WL 1877808, at *2 (D. Me. Aug. 24, 2004) (chastising plaintiff for responding to defendant's statement of material facts by failing to cite to the record and for using cross-references that in most cases referred to other additional statements in response to defendant's singular statement, stating "[p]resumably [plaintiff] found this technique expeditious.  I, however, did not."); *Leanard v. Inhabitants of the Town of Van Buren*, 182 F. Supp. 2d 115 (D. Me. 2002) (deeming defendants' facts admitted in part because "many of Plaintiff's statements do not actually controvert the Defendants' fact that they purport to address").

While the purpose of Rule 56.1 was to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Finnegan*, 101 F.3d at 151, the Court shall accept the additional burden placed on it by Plaintiff and shall not – in this instance – strike Plaintiff's Response to Defendants' Statement or accept all of Defendants' facts as undisputed. Rather, the Court shall carefully parse the record and both sets of "Material Facts Not in Dispute" when outlining the background of this dispute.

Section 8(a) minority disadvantaged business.  Defs.' Stmt. ¶ 1; Pl.'s Resp. ¶ 1.  At the time relevant

to this suit, PM Services had over one hundred (100) employees.  Pl.'s Stmt. ¶ 6; Defs.' Resp. ¶ 6.

Defendant OAI is a Maryland-based company, formed in 1998, that provides commercial

construction management and O&M services primarily in the District of Columbia.  Defs.' Stmt. ¶

4; Pl.'s Stmt. ¶ 4.  Like PM Services, OAI's chief source of revenue is through service contracts

with the GSA.  *Id.*  OAI is also a Section 8(a) business, and – as such – is eligible to be awarded

GSA contracts as a sole source contractor.  *Id.*  OAI's Chief Executive Officer Ablade Odoi-Atsem

("Odoi-Atsem") has approximately twenty-five (25) years of experience in government-owned or

government-subsidized construction.  *Id.*  In 2003, Odoi-Atsem decided to expand the scope of

OAI's services to include O&M services, and began to look for qualified and experienced employees

to grow his company in the O&M field during the first half of that year.  *Id.*

Defendant O'Shea was an employee of PM Services from February 2000 to June 2003, Pl.'s

Stmt. ¶¶ 22, 75; Defs.' Resp. ¶¶ 22, 75, and has been in the official employ of OAI since July 2003,

Defs.' Stmt. ¶ 25; Pl.'s Resp. ¶ 25.  O'Shea graduated from high school in 1974, after which he

completed various liberal arts courses at DeKalb Community College in Clarkston, Georgia.  Defs.'

Resp. ¶ 19.  Thereafter, for approximately eleven (11) years, O'Shea worked for Winn Dixie,

beginning at the grocery level and rising to become the Department Manager of the meat

department.  Pl.'s Stmt. ¶ 19; Defs.' Resp. ¶ 19.  During his time at Winn Dixie, O'Shea often

"migrated to mechanical" repairs and frequently performed "a lot of little minor maintenance repairs

for them as well."  Defs.' Mot. for Summ. J., Ex. A (O'Shea Dep.) at 10-14.  In 1991, O'Shea

moved to the District of Columbia area and obtained employment as the Watch Engineer and

Assistant Chief Engineer at Polinger Shannon & Luchs Company, where he was responsible for the

life safety, energy management systems, the HVAC systems, the electrical and plumbing systems,

and all planned maintenance and mechanical repairs.  Defs.' Resp. ¶ 20; *see also* Defs.' Opp'n to

Pl.'s Mot. for Summ. J. ("Defs.' Opp'n"), Ex. 1 (O'Shea's Resume and Related Documents).  In his

positions, O'Shea also supervised the engineering staff, managed budget and payroll issues, and

maintained inventory control of supplies and equipment.  *Id.*  In 1992, O'Shea was certified as a

Class 1 and Class 3 Stationary Engineer through the International Union of Operating Engineers,

and in 1993 and 1994, was certified to engage in HVAC Level I and II work at the Frederick

Community College in Frederick, Maryland.  *Id.*  O'Shea has no less than ten (10) additional

certifications, licenses, or training in connection with skills relevant to the O&M industry.  *Id.*; *see*

*also* Defs.' Opp'n, Ex. 1 (O'Shea's Resume and Related Documents) at 1.

In 1995, O'Shea moved to Day & Zimmerman (née Tate Facilities), where he was promoted

to Chief Engineer and supervised approximately twelve (12) to fourteen (14) employees in Postal

Square Building A, a facility covering approximately 1.2 million square feet.  Defs.' Resp. ¶ 20.  In

this position, O'Shea also oversaw life safety, energy management systems, HVAC systems, and the

electrical and plumbing systems, including all planned maintenance and mechanical repairs.  *Id.*  On

February 14, 2000, PM Services hired O'Shea as its Chief Engineer at the Cohen & Switzer

buildings owned by the federal government.  Pl.'s Stmt. ¶ 22; Defs.' Resp. ¶ 22.  During the course

of his employment with PM Services, O'Shea never entered a non-competition or non-solicitation

agreement with PM Services, or any other agreement containing a restrictive covenant in PM

Services' favor.  Defs.' Stmt. ¶ 3 (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 102:16-

21, 103:1-7); Pl.'s Resp. ¶ 3 (admitting).

B.      *The History of PM Services' O&M Contract for the Cohen & Switzer Buildings*

Roughly one and a half (1.5) years prior to PM Services' decision to hire O'Shea, PM

Services won a contract with the GSA to provide O&M services for the Cohen & Switzer buildings.

Pl.'s Stmt. ¶ 9; Defs.' Resp. ¶ 9; Defs.' Stmt. ¶ 5; Pl.'s Resp. ¶ 5.  The contract – which was the first

GSA contract awarded to PM Services in the District of Columbia, Pl.'s Stmt. ¶ 8; Defs.' Resp. ¶ 8

(noting the citation upon which Plaintiff's assertion is based does not support this contention) – was

originally awarded through the GSA's competitive bid process as a SBA set-aside, Pl.'s Stmt. ¶ 9;

Defs.' Resp. ¶ 9; Defs.' Stmt. ¶ 5; Pl.'s Resp. ¶ 5.  The contract, which commenced on October 1,

1998 ("the 1998 Contract"), was for a one-year (1) term, with four (4) consecutive one-year (1)

options available at the sole discretion of the GSA.  *Id*.  If the GSA chose to exercise all options

under the 1998 Contract, the contract would expire at the end of September 2003.  *Id*.  The Cohen

& Switzer O&M contract was contracted through and administered by the GSA's National Capital

Region, where the contracting officer was Tom Russell and later Mike Vrobel.  Pl.'s Stmt. ¶ 10;

Defs.' Resp. ¶ 10.  The on-site GSA representatives in the Cohen & Switzer buildings were overseen

by the GSA's Section Chief of the D.C. Service Center, Scott Taylor.  Pl.'s Stmt. ¶ 10; Defs.' Stmt.

¶¶ 6, 15.

      During roughly the first two (2) years of the 1998 Contract, PM Services was not

performing its O&M services for the Cohen & Switzer buildings at a level acceptable to the GSA.

Defs.' Stmt. ¶ 6 (citing Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 27:11-18 ("[T]he

beginning part of their contract was pretty rough.  You know, it wasn't functioning well."); *id*., Ex.

11 (Russell Dep.) at 13:21-22, 14:1-11 ("On this particular contract during the first two years we

were meeting about once a month because performance wasn't up to a level where we wanted it."));

Pl.'s Resp. ¶ 6 (disputing that it was not performing at an acceptable level, but offering no evidence

to contradict the testimony of Taylor and Russell of the GSA).  During this time period, PM

Services regularly received complaints from Cohen & Switzer tenants and GSA representatives

regarding PM Services' failure to provide effective or efficient O&M services.  Defs.' Stmt. ¶ 7;

Defs.' Mot. for Summ. J., Ex. 12 (Sampling of Complaints Re: PM Services); Pl.'s Resp. ¶ 7

(contending that this information is immaterial, but not denying the allegation).  Despite these

problems, GSA continued to exercise the four (4) option years on the 1998 Contract until the

completion of those options in 2003.  Pl.'s Stmt. ¶ 16; Defs.' Resp. ¶ 16.

     C.     *Improvements Following PM Services' Decision to Hire O'Shea*

 Following his hiring by PM Services on February 14, 2000, PM Services promoted O'Shea

to Project Manager for the Cohen & Switzer building on April 1, 2000.  Pl.'s Stmt. ¶ 23; Defs.'

Resp. ¶ 23.  O'Shea had never held a project management position prior to his employment with PM

Services.  Pl.'s Stmt. ¶ 21; Defs.' Resp. ¶ 21.  In addition to his duties as Project Manager, O'Shea

retained his responsibilities as Chief Engineer of the Cohen & Switzer until he hired, on behalf of

PM Services, Charles Anthony ("Tony") Wehausen – a former supervisor from another job – to act

as Chief Engineer.  Pl.'s Stmt. ¶¶ 23-24; Defs.' Resp. ¶¶ 23-24.  Wehausen had been an Assistant

Chief Engineer for large O&M contracts in the District of Columbia area for four (4) years, and had

spent seven (7) years as a Chief Engineer for another large O&M contract.  Pl.'s Stmt. ¶ 24; Defs.'

Resp. ¶ 24.

     Following the twin hirings of O'Shea and Wehausen, both the GSA and the tenants of the

Cohen & Switzer buildings immediately noticed an improvement in the performance of PM Services

in its O&M duties.  *See* Defs.' Mot. for Summ. J., Ex. 13 (Apr. 24, 2001 Letter from Taylor to PM

Services) ("Notable progress has been made through the diligent efforts of your current team.  We

have seen a dramatic improvement . . . . I personally appreciate the level of commitment and

professionalism demonstrated by your Project Manager, Bill O'Shea, and your Chief Engineer,

Tony Wehausen."); *id.*, Ex. 11 (Russell Dep.) at 13:21-22, 14:1-11 ("So I can't remember if it was

the second or third year, but once PM Services hired I believe it was Bill O'Shea and [Tony

Wehausen] . . . [o]nce they brought them on board and they brought on Jim [Butland], performance was up to speed."); *id.*, Ex. 14 (Dep. of Nico Martherus, co-owner of PM Services and its Vice President, Secretary and Chief of Operations) ("Martherus Dep.") at 18 (noting that O'Shea worked "diligently," agreeing that O'Shea "often tr[ied] to present ideas on how the company could save money," and testifying that O'Shea "work[ed] hard to make sure that he was in touch with the employees and what they needed and how they felt").

D.      *PM Services Expands and O'Shea Is Promoted*

Following these successes and its certification as a Section 8(a) minority business in June 2001, PM Services expanded its operations within the District of Columbia and in the surrounding area.  Pl.'s Stmt. ¶ 12; Defs.' Resp. ¶ 12.  The GSA awarded O&M contracts to PM Services for the FBI Washington Field Office and the A.V. Bryan Federal Courthouse, located in Alexandria, Virginia, in late 2002.  Pl.'s Stmt. ¶ 13; Defs.' Resp. ¶ 13.  These contracts, which were each three (3) years in length, were awarded directly to PM Services by the GSA pursuant to its Section 8(a) status, as the SBA's small business bidding exception allows minority disadvantaged businesses to be awarded a contract directly, without bid, as a sole source provider.  Pl.'s Stmt. ¶ 14; Defs.' Resp. ¶ 14.  In early 2003, the GSA also awarded PM Services the O&M contract for the Franconia Warehouse in the District of Columbia, this time through a competitive bid process.  Pl.'s Stmt. ¶ 15; Defs.' Resp. ¶ 15.  As was the case with the 1998 Contract covering the Cohen & Switzer buildings, the GSA renewed each of its options under these contracts with PM Services.  Pl.'s Stmt. ¶ 17; Defs.' Resp. ¶ 17.

On October 1, 2002, Carole Metour, co-owner, President and Chief Operating Officer of PM Services, appointed O'Shea to the newly-created position of Interim Washington Metro Manager.  Pl.'s Stmt. ¶ 25; Defs.' Resp. ¶ 25.  As Interim Manager, O'Shea reported directly to COO

Martherus.  *Id.*  O'Shea's authority as Interim Manager was to facilitate project management for

PM Services' existing contract at the Cohen & Switzer building as well as the anticipated contracts

at the A.V. Bryan Courthouse and the FBI Washington Field Office.  *Id.*  O'Shea's appointment

also contemplated the November 2002 creation of a separate division called "the Technical Services

group," which would bid on and provide more technical "reimbursable" prevention and repair work

to the GSA ("RWA work") that was separately billed to, and not included in, the GSA contract

specifications.  Pl.'s Stmt. ¶¶ 18, 26-27; Defs.' Resp. ¶¶ 18, 26-27 (agreeing, but noting that nothing

in the record supports the November 2002 date).  After serving for fifteen (15) months as the Chief

Engineer at Cohen & Switzer, Tony Wehausen was placed in charge of the Technical Services

group and PM Services' RWA work.  Pl.'s Stmt. ¶ 27; Defs.' Resp. ¶ 27.  Wehausen and the

Technical Services division operated out of the Cohen & Switzer buildings and worked with COO

Martherus.  *Id.*  O'Shea was not involved with the creation of the Technical Services division.  *See*

Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 107 (O'Shea testifies only that the creation of the

division was "a pretty good idea," that he was "not sure who came up with it," and that he had no

title in the division).

On January 31, 2003, O'Shea was appointed to a different position within PM Services –

Interim Regional Director.  *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 32:1-34:12; Pl.'s

Stmt. ¶ 28; Defs.' Resp. ¶ 28.  In his new capacity, O'Shea was now charged with looking after

additional buildings in the area for which PM Services had acquired O&M contracts; his

responsibilities covered the Cohen & Switzer buildings, the FBI Washington Field Office, the A.V.

Bryan Courthouse, and the Franconia Warehouse, as well as two other recent O&M facilities for

which PM Services had contracted – McGuire Air Force Base and the E. Barrett Prettyman

Courthouse in Washington, D.C.  *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 33:8-36:21.

In his various positions with PM Services, O'Shea had the authority to hire and fire employees, and could negotiate salaries with individuals hired by him on behalf of PM Services. *Id.* at 46:5-20. Near the end of his tenure with PM Services, O'Shea had begun to work closely with his supervisor, COO Martherus, and another PM Services employee, Vicky Stracharski, to develop proposals and numbers to assist PM Services in the bidding process for O&M contracts on other buildings. *Id.* at 46:21-47:5; 48:7-20. However, O'Shea's role in this process was somewhat limited, as Martherus clearly had control over the process; O'Shea instead concentrated on helping Martherus by "throw[ing] out ideas of how we could maybe cut corners and make our number . . . more competitive, and it was more of less his decision." *Id.* at 46:10-20, 48:7-17. There is no evidence in the record that O'Shea worked with either PM Services' Corporate Facilities Manager Jim Butland and CEO Meteor on bidding for GSA contracts. *Compare* Pl.'s Stmt. ¶ 30 (making certain assertions about what O'Shea "admitted" in his deposition) *with* Defs.' Resp. ¶ 30 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 47-48, 51-52, 55:9-15, 56-57, 58) (indicating a lack of support for Plaintiff's characterization of O'Shea's testimony). Moreover, the testimony on record indicates that O'Shea did not participate in discussions with the GSA regarding PM Services' competitive bids, and was not given the authority to discuss and/or negotiate various aspects of PM Services' GSA contracts with the GSA contacting officer for the Cohen & Switzer building, Tom Russell. *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 50:20-51:21, 56-57, 58.

While PM Services now contends that O'Shea "was privy to PM Services' proprietary information, including how PM Services calculated profit margins on bids, vendor and subcontractor lists and costs, employee lists, profit margins, wage structures and GSA contracts," Pl.'s Stmt. ¶ 29, the record does not completely support this wide characterization. First, PM Services' delineation of what constitutes its "proprietary" information is flawed, given that certain types of information –

11

such as the details of its GSA contracts and an identification of its employees, subcontractors, and

vendors – are listed in GSA contracts and maintained as a public record.  *See* Defs.' Resp. ¶ 29.

Moreover, a reading of O'Shea's deposition testimony refutes an assertion that he had proprietary

knowledge of PM Services' "profit margins" or "how PM Services calculated profit margins on

bids" independent of documentation that would have refreshed his memory.  *Compare* Pl.'s Stmt. ¶

29 (making certain allegations as to what O'Shea testified to in his deposition) *with* Defs.' Mot. for

Summ. J., Ex. 3 (O'Shea Dep.) at 99:16-101:2 (testifying that "I don't know how corporate

calculates down there . . . . I'm not sure what the final number was because I never saw it in 2002,

but I think it was close to a half mil, I'm talking gross now.  We did half a mil or maybe 600,000.

I'm not sure, close to that, I don't know exactly.").

     E.     *Problems Develop Between PM Services and O'Shea During the Spring of 2003*

Despite the growth of PM Services and the continued expansion of O'Shea's duties, certain

problems began to develop between PM Services and O'Shea by the Spring of 2003.  By April

2003, CEO Metour had become concerned about O'Shea's readiness to manage at the Regional

Manager level.  Pl.'s Stmt. ¶ 37; Defs.' Resp. ¶ 37; *see also* Pl.'s Resp. ¶ 9 ("In any case, O'Shea's

performance while at PM Services was mixed and declined once he became an upper level manager.

The testimony indicates that while he was a competent Chief Engineer and Project Manager,

resulting in PM Services placing him in higher and higher levels of trust, his abilities in his

temporary upper management position proved to be limited.").  According to Metour, two incidents

were the basis for this concern.  First, Metour testified that O'Shea had apparently signed a contract

to purchase $10,000 worth of new furniture and equipment without any authority, and that he had

authorized or allowed three (3) lower-level employees to sign three (3) separate five (5) year

contracts for leased uniforms after Metour had expressly told him that she did not yet wish to

proceed to lease uniforms.  Pl.'s Stmt. ¶ 37; Defs.' Resp. ¶ 37.  Second, Metour noted that after a

meeting with all local project managers and production control clerks on Friday, May 2, 2003, she

was informed by one of the project managers under O'Shea that O'Shea had asked him to write

down hours on O'Shea's son's time card (who worked for PM Services at the time) that his son had

not worked.  Pl.'s Stmt. ¶ 40; Defs.' Resp. ¶ 40 (noting that there is no evidence to support this

allegation and the project manager who supposedly reported this no longer works for PM Services,

and pointing out that Metour lacks first-hand knowledge of the incident, could not remember the

approximate time period of the event, and could not identify where the former project manager now

works).

As a result of Metour's apparent concerns, in approximately April 2003, PM Services

removed O'Shea without explanation from his position as Regional Director and assigned him to the

role of "temporary interim project manager" at the Franconia Warehouse without a change in salary

for what was termed "an evaluation period."  Defs.' Stmt. ¶ 13; Pl.'s Resp. ¶ 13.  On May 27, 2003,

Metour telephoned O'Shea and advised him that, in consideration of the evaluation period instituted

in April 2003, he would not be reinstated as Regional Director of PM Services' District of Columbia

facilities.  Defs.' Stmt. ¶ 22; Pl.'s Resp. ¶ 22 (denying this, but providing no supporting evidence

and only generally referencing its own Statement of Material Facts Not in Dispute with no pin cite);

*compare with* Pl.'s Stmt. ¶ 41 (essentially admitting the substance of Defendants' contention);

Defs.' Resp. ¶ 41.  Instead, Metour gave O'Shea a four (4) hour window in which to decide whether

he would accept a Project Manager position at the Cohen & Switzer buildings or at the Franconia

Warehouse complex.  *Id.*; *see also* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 230:11-15;

Defs.' Mot. for Summ. J., Ex. 2 (O'Shea Aff.) ¶ 10.  Metour testified that she demoted O'Shea to

Project Manager because he "did not have the capacity . . . to do" the tasks associated with being

Regional Manager.  *Id.*; *see also* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 232:8-9.  A PM

Services memorandum dated May 27, 2003 confirms that O'Shea was demoted to Project Manager.

*Id.*; *see* Defs.' Mot. for Summ. J., Ex. 16 (May 27, 2003 Memorandum).  By this point, Metour

"didn't value [O'Shea] as an employee any longer" but admitted that she had neglected to confront

him about any of the problems she identified as having caused her to doubt his capacity as Regional

Director.  Defs.' Resp. ¶ 37; Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 244:8-16.

　　　At the same time, O'Shea was also becoming disenchanted with PM Services.  Believing

that he added value to PM Services and that he had proven his dedication to the company, O'Shea

grew interested in forging a long-term contract with PM Services to provide him with the job

security that at-will employment lacked.  Defs.' Stmt. ¶ 10 (citing Defs.' Mot. for Summ. J., Ex. 3

(O'Shea Dep.) at 81:2-4, 174:21-22, 175:1-15); Pl.'s Resp. ¶ 10 (contending that this fact is

irrelevant and immaterial, but not denying the truth of the matter asserted).  PM Services had

assured O'Shea on several occasions that a contract of employment would be negotiated and offered,

but – despite these assurances – had never entered into negotiations with him "because the money

was not there."  Defs.' Stmt. ¶¶ 11-12 (citing Defs.' Mot. for Summ. J., Ex. 14 (Matherus Dep.) at

26:17-21, 27:1-11, 29:11-14); Pl.'s Resp. ¶¶ 11-12 (cross-referencing Plaintiff's Response  ¶ 10,

which contends that the fact stated is irrelevant and immaterial, but not denying the truth of the

matter asserted).  Given PM Services' failure to provide him with a long-term contract and his April

2003 demotion, O'Shea decided to start actively searching for a position with another firm.  Defs.'

Stmt. ¶ 14 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 79:1-9, 109:6-14, 110:21-22,

111:1-4 ("It was after I got put to the interim [at] Franconia, I thought about it for a few days . . . . I

got depressed there for a while, but I decided I would put my feelers out, you know.  You know, I

just called the local to see what they had on the job line.")); Pl.'s Resp. ¶ 14 (contending that this

fact is irrelevant and immaterial, but not denying the truth of the matter asserted).

      F.     *Problems Develop With PM Services' Performance on the O&M Contract for the Cohen & Switzer Buildings Near the End of the 1998 Contract's Term*

During the Spring of 2003, PM Services' performance on its O&M contract for the Cohen & Switzer buildings dropped considerably.  Defs.' Stmt. ¶ 52; Pl.'s Resp. ¶ 52 (contending that performance issues for at least part of this period would have been overseen by O'Shea, but not denying the truth of the matter asserted).  According to the GSA's Section Chief of the D.C. Service Center, Scott Taylor:

> We were not pleased with the service at the time of PM Services.  They had – in all fairness they had gone through a stint of, you know, performing very well, but during the last, you know, six to eight months of that term we had a lot of complaints from tenants of the building.  A lot of that was based on not responding to service calls, a lot of the hot/cold calls.  The standard expectation is you respond in person, talk to the client in the space, take a temperature reading in the space.  You just don't just sit downstairs and take it off the computer.  Well, that's what they were doing.

> And believe it or not, I had complaints from my boss's boss, Jack Gott, because [PM Services] had left the Switzer building in a state where the sprinkler system, part of the sprinkler system was inoperable, and that's just – I mean that's a cardinal sin in the buildings management world.  And that appeared to be nothing sort of inability to obtain and control subcontractors, which is something that we do rely on an O and M contractor to do.  And we had the – that whole reimbursable job, anything that we pay extra for, we had – we had multiple problems with the crew, the current project manager and chief that were there.  They are very pleasant gentlemen, don't get me wrong, you know, they were never . . . argumentative, but they over-promised and under-delivered.  You know, the price would be high.  They would miss deadlines.  You wouldn't know about the missed deadline until you went to ask about it again, only find out, oh, yeah, well, we didn't get to it, but we will get to it, you know, by X date.  X date comes, and it doesn't happen again.

Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 22-23.  Despite the fact that Taylor communicated these difficulties to Metour, Martherus, and Mike Wells (the Project Manager who replaced O'Shea at the Cohen & Switzer buildings), PM Services failed to cure its performance problems.  Defs.' Stmt. ¶ 54; Pl.'s Resp. ¶ 54 (simply cross-referencing Plaintiff's Response ¶ 52, which contended

that performance issues for at least part of this period would have been overseen by O'Shea, but not

denying the truth of the matter asserted).

      G.     *O'Shea Contemplates Leaving PM Services and Comes Into Contact With Odoi-*
               *Atsem*

      After his demotion from Regional Director in late April 2003, O'Shea began to let a few of

his colleagues know that he was considering leaving PM Services' employ and was looking for a

potential new employer. Defs.' Stmt. ¶ 15; Pl.'s Resp. ¶ 15 (not denying the truth of the assertion).

One of the individuals to whom O'Shea made mention of his job search was Scott Taylor of the

GSA. *Id.* Given Taylor's position as the Section Chief of the GSA's Service Center, which

included the Cohen & Switzer buildings for which O'Shea had previously acted as Project Manager,

O'Shea had occasion to speak with Taylor on a fairly frequent – although irregular – basis. *Id.*; *see*

*also* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 49:4-7, 76:16-18 (testifying that he would

interact with GSA representatives daily at times, but at other times several months would go by

without communication); 77:15-18 (estimating that he communicated with Taylor "a couple dozen

times"); Pl.'s Mot. for Summ. J., Ex. Y (Summary of O'Shea's Nextel Phone Records) (O'Shea

called Taylor on his company phone seven (7) times in May-June 2003). According to O'Shea, "I

mentioned something to Scott I think about [the job search]. Basically I mentioned it to him in the

context of, you know, if anybody is out there looking for somebody, let me know." Defs.' Stmt. ¶

15 (quoting Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 109:18-21); *see also* Pl.'s Stmt. ¶ 43

(attempting to use phone records to determine that this conversation took place on Friday, May 2,

2003); Defs.' Resp. ¶ 43 (pointing out that the phone records indicate the May 2, 2003 conversation

between O'Shea and Taylor lasted one (1) minute). O'Shea also shared his feelings with his co-

worker, Chief Engineer Tony Wehausen. Defs.' Stmt. ¶ 16; Pl.'s Resp. ¶ 16 (not denying the truth

of the matter asserted).  O'Shea testified that "Tony approached me one day and asked me . . . what was going on with me because he knew I was upset, pretty upset about the . . . demotion.  And I told him I was looking to get another opportunity."  Defs.' Stmt. ¶ 16 (quoting Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 110:21-22, 111:1-8).  In response, Wehausen shared with O'Shea that he too was considering looking for other employment because he "was pretty fed up with the way things were going."  *Id.*

During the same time period, Defendant OAI, led by its Chief Executive Officer Ablade Odoi-Atsem, was looking to expand.  Defs.' Stmt. ¶ 17; Pl.'s Resp. ¶ 17.  Prior to this time, OAI provided exclusively construction management services.  *Id.*  Neither OAI nor Odoi-Atsem had a background in O&M work.  Pl.'s Stmt. ¶ 54; Defs.' Resp. ¶ 54.  However, Odoi-Atsem had a considerable background in the federal contract industry, an MBA from American University in finance and international business, a degree in building technology (which included education in the fields of civil, electrical, mechanical, and structural engineering), and had honed his skills providing services in the construction management industry for approximately twenty-five (25) years.  Defs.' Resp. ¶ 54; *see also* Defs.' Mot. for Summ. J., Ex. 8 (Odoi-Atsem's Resume); *id.*, Ex. 9 (Taylor Dep.) at 38-39 (testifying that the skills involved in the construction management industry translate well into, and are compatible with, O&M work); Pl.'s Mot. for Summ. J., Ex. B (Odoi-Atsem Dep.) at 147-49 (same).  Like PM Services, OAI generated most of its revenue from government contracts. Defs.' Stmt. ¶ 17; Pl.'s Resp. ¶ 17.

Odoi-Atsem let it be known that he was interested in growing his company in the O&M field, and, specifically, that he was seeking new employees within the industry.  Defs.' Stmt. ¶ 18; Pl.'s Resp. ¶ 18.  Having known Scott Taylor professionally since 2000, Odoi-Atsem informed Taylor in the Spring of 2003 of his intentions and his company's need for qualified, experienced

employees in the O&M field.  *Id.*  Odoi-Atsem also had a similar conversation with Rene Lilicotch

of Precision Mechanical Services during this time period.  *See* Defs.' Mot. for Summ. J., Ex. 6

(Odoi-Atsem Aff.) ¶ 5.  OAI was rather small at this point, with three (3) to four (4) employees, an

additional four (4) to five (5) independent contractors, and with approximately two (2) offices – one

in Odoi-Atsem's home and the other in the GSA Regional Office Building.  Pl.'s Stmt. ¶ 55; Defs.'

Stmt. ¶ 55.  Given its size and level of experience, it was unlikely that OAI could have obtained a

sole-source contract as it was constituted during the Spring of 2003.  Pl.'s Stmt. ¶ 53; Defs.' Stmt. ¶

53.

    After learning of the symbiotic interests of OAI and O'Shea, Rene Lilicotch – a mutual

acquaintance of both O'Shea and Odoi-Atsem – provided O'Shea's telephone number to Odoi-

Atsem and suggested that he meet with O'Shea to explore their common objectives.  Defs.' Stmt. ¶

19; Defs.' Mot. for Summ. J., Ex. 6 (Odoi-Atsem Aff.) ¶ 6; Pl.'s Resp. ¶ 19 (denying this, but

providing no supporting evidence and only generally referencing its own Statement of Material Facts

Not in Dispute with no pin cite); Pl.'s Stmt. ¶ 45 (pointing out that O'Shea's telephone records

indicate that he had an outgoing phone call to Odoi-Atsem on May 5, 2003); Defs.' Resp. ¶ 45

(noting that there is no record confirming Odoi-Atsem's office telephone number at this time, the

handwritten legend on Plaintiff's exhibit containing the telephone records is of unknown and

unidentified origin, and that the identified phone call lasted three (3) minutes).  After a few phone

calls during early May between O'Shea and Odoi-Atsem, and between Odoi-Atsem and Taylor, *see*

Pl.'s Stmt. ¶¶ 48-49, Defs.' Resp. ¶¶ 48-49 (making objections similar to its objections in

Defendants' Response ¶ 45 and noting that the identified calls lasted one (1) minute, two (2)

minutes, and one (1) minute, respectively), O'Shea and Tony Wehausen met with Odoi-Atsem over

lunch in early May, Pl.'s Stmt. ¶ 49; Defs.' Resp. ¶ 49.

The first meeting was a "get acquainted" lunch meeting with "small talk," wherein the men introduced themselves and discussed their professional backgrounds and objectives. Defs.' Stmt. ¶ 20 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 128:4-22); Pl.'s Resp. ¶ 20 (denying this, but providing no supporting evidence and only generally referencing its own Statement of Material Facts Not in Dispute with no pin cite). During this meeting, Odoi-Atsem expressed his interest in expanding the sphere of OAI's services to include O&M work, while O'Shea and Wehausen let Odoi-Atsem know that they would be talking with some other people and would re-connect with him in about one (1) week. *Id.* Following further phone contact between O'Shea and Odoi-Atsem, *see* Pl.'s Stmt. ¶ 50 (identifying two calls between the two on May 13, 2003, and three conversations between the two on May 15, 2003); Defs.' Resp. ¶ 50 (making objections similar to its objections in Defendants' Response ¶ 45), O'Shea and Wehausen met with Odoi-Atsem at the GSA Regional Office Building, where Odoi-Atsem was performing construction management work for the GSA, *see* Pl.'s Stmt. ¶ 51 (placing this meeting on May 19, 2003); Defs.' Resp. ¶ 51 (pointing out that the cited deposition testimony only indicates that the second meeting was one (1) week to ten (10) days later, but does not specifically identify the day). During this second meeting, the three men discussed more specifically the possibility of working together. Defs.' Stmt. ¶ 21 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 129:13-22, 131-134, 138); Pl.'s Resp. ¶ 21 (denying this, but providing no supporting evidence and only generally referencing its own Statement of Material Facts Not in Dispute with no pin cite). However, no offer employment had yet been made by OAI, and no commitments of any other sort were made at that time. *Id.*

H.      *O'Shea's Contact With OAI Intensifies*

On May 19, 2003, O'Shea submitted a vacation leave request to PM Services for June 4 through June 10, 2003. Pl.'s Stmt. ¶ 56; Defs.' Resp. ¶ 56. According to O'Shea, he had not yet

decided whether he would ultimately resign from PM Services when he put in his leave request.  *Id.*

On May 20, 2003, O'Shea sent an email from his American On-Line ("AOL") account to OAI that

attached a document entitled "Contract Compensation Issues."  *See* O'Shea Dep. Ex. 8-9 (May 20,

2003 Email from O'Shea to OAI); *see also* Defs.' Resp. ¶ 57 (noting that O'Shea was not certain in

his deposition if the document entitled "Contract Compensation Issues" was attached to his May 20,

2003 email).  According to O'Shea, the "figures" listed in the attached document were "firm."  *Id.*

In his proposal, O'Shea suggested, *inter alia*, that (1) he would join OAI; (2) he should have "100%

control" over its "operations & maintenance contracts"; (3) and that he, Odoi-Atsem, and Wehausen

split the company's profits – including "RWA" work – by 1/3 each.  *Id.*  O'Shea stressed that his

ultimate contract with OAI would be "contingent" upon its "acquisition of [a] primary operations &

maintenance contract."  *Id.*  O'Shea further commented that "[t]here is potential for a windfall from

our mechanical services provider that we conceptualized and implemented less than six (6) months

ago."  *Id.*; Defs.' Resp. ¶ 57 (noting that PM Services cites no evidence in the record demonstrating

or implying such a windfall, and citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 169:4-9

(O'Shea characterizes this language as him "just trying to sell myself to a prospective employer"

and "running on at the mouth")).  O'Shea signed off his email by suggesting, "Let me know if you

wish to continue."  *Id.*

1.   <u>Email Communications</u>

Over the next few days, O'Shea sent Odoi-Atsem three significant emails.  The first, sent on

May 21, 2003, was entitled "Next Step."  *See* O'Shea Dep. Ex. 10 (May 21, 2003 Email from

O'Shea to OAI).  In pertinent part, O'Shea's email stated:

> We [presumably, O'Shea and Wehausen] have met all of the 8A sponsors that we
> are interested in partnering with.  It is our intentional to close a deal by June 1.  We

20

> have requested that all of our prospective sponsors provide us with an offer in writing by COB May 30.  This will allow us to review the offer sheets and make a responsible decision by June 1 . . . . If and when we have an agreement, our intention will be to inform GSA of our alliance on June 1.  This will allow us to immediately begin the process of preparing our technical and price proposals.  After we have signed a contract (on or before June 12) we can proceed with all of the startup particulars.

*Id.*; *see also* Pl.'s Stmt. ¶ 62 (misidentifying the email as having been sent on May 20, 2003); Defs.'

Resp. ¶ 62 (admitting, but arguing that this email demonstrates that O'Shea forestalled preparing

proposals until after a firm deal for employment with OAI was entered).

The second email, entitled "Phone Call," was sent by O'Shea to OAI on May 23, 2003.  *See*

O'Shea Dep. Ex. 11 (May 23, 2003 Email from O'Shea to OAI).  This email read:

> I received a phone call from Scott [Taylor] yesterday evening.  *We are going to get together next week to discuss an opportunity that has recently surfaced.*  During our conversation he mentioned the meeting that he had with you this week.  He alluded to the fact that *he would feel comfortable proceeding with our alliance.*  I told him that we also have more of a personal comfort zone with you and your company.
>
> *Additionally, he mentioned that timing is becoming increasingly critical.  He cautioned me that if the offer goes out to another Company than* [sic] *there will be nothing that we can do to retrieve it.*  Because of these comments, it may be advantageous for us to schedule another meeting and see if we can expedite this process to make our alliance a reality.  *All we will need to do is let him know that we are proceeding with our alliance and we can secure this excellent opportunity.*  Thanks, Bill.

*Id.* (emphasis added); Pl.'s Stmt. ¶ 63; Defs.' Resp. ¶ 63 (admitting, but adding that O'Shea testified

that he believed the email referenced a call from Taylor about RWA work that Taylor wanted OAI

to perform, that he did not discuss the Cohen & Switzer contract with Taylor, and that his contact

with Taylor was not as concrete as he made it sound in his emails (citing Defs.' Mot. for Summ. J.,

Ex. 3 (O'Shea Dep.) at 177-78); also pointing out that Taylor did not "have a clue" what the May

23 email was referencing (citing Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 69-70).

The third relevant message sent during this time period by O'Shea to Odoi-Atsem was a

May 30, 2003 email entitled "Revision of Offer Letter & Service Contract Proposal." *See* O'Shea

Dep. Ex. 12. This email was drafted and sent by O'Shea after his May 27, 2003 conversation with

Metour, wherein PM Services informed him that he would not be returned to the position of

Regional Director and instead gave him the option of remaining at the Franconia Warehouse or

returning to the Cohen & Switzer buildings. Pl.'s Stmt. ¶ 67; Defs.' Resp. ¶ 67 (noting that

Metour's memorandum dated May 27, 2003 announced that O'Shea would be returning to the

Cohen & Switzer buildings, but stressing that all had agreed that O'Shea's choice to remain at the

Franconia Warehouse would be honored). In pertinent part, O'Shea's May 30, 2003 email to Odoi-

Atsem states:

> 1) In order for your Company to issue a 1099, it is necessary for your Company to receive a Service Contract Proposal from us for your records and for your Company to issue us a Purchase Order that reflects the terms of the Service Contract Proposal.
>
> 2) The Offer Letter (Contract) has nothing to do with our proposed five (5) year agreement that is contingent on the procurement of the first GSA contract. *If you remember correctly, when we had our initial meetings Tony and I were going to remain with PM Services until the final hour. We were later told by Scott that it would be necessary for Tony and I to resign from our current employer, in order for us to be awarded our first contract.*
>
> *Nonetheless, I feel extremely confident that you will be awarded our first contract as expected.* Therefore, I added an exculpatory clause for your protection that allows us 90 days of salary in case we fail. This is for our protection as well and will allow us time to seek other employment.
>
> *As you are aware, Tony and I are assuming some of the risk as well, in as much as we are taking a chance with you as our sponsor.* If you recall, the reason we were introduced to one another is because we were considered to be compatible. We all agree that there is a certain amount of calculated risk that is assumed when you form a business partnership. It would be [an] unreasonable risk to request for Tony and I to agree to any contingency when it comes to the support of our families.
>
> On the other hand, Tony, you[,] and I are going to be very successful, even if we don't get a contract in the first five months of our relationship. I am expecting to

> procure one million dollars in service work by the end of the year.  Remember, last
> year we were able to complete over 2.5 million dollars in gross revenue performing
> service work at one at one [sic] facility.

O'Shea Dep. Ex. 12; Pl.'s Stmt. ¶ 68; Defs.' Resp. ¶ 68 (admitting, but noting that O'Shea could

not remember the conversation referenced in this email, and Taylor denied that he discussed with

O'Shea obtaining O&M work for another company while O'Shea was employed by PM Services)

(citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 184-85; *id.*, Ex. 9 (Taylor Dep.) at 72).

### 2.   What Work Was Contemplated in These Discussions by the Expanded OAI?

Upon a plain reading of these three (3) emails drafted by O'Shea, stretching from May 21,

2003 to May 30, 2003, PM Services contends that the "excellent opportunity" and anticipated

"contract[s]" contemplated by O'Shea for his new "alliance" with OAI and Wehausen constituted

three types of work that were business opportunities for PM Services:  (1) O&M contract work for

Federal Office Building 8 ("FOB-8"), *see* Pl.'s Stmt. ¶ 58; (2) RWA work, such as the work

contemplated by PM Services' Technical Services group, *id.* ¶¶ 59-60; and (3) the O&M contract

for the Cohen & Switzer buildings, a contract that PM Services held at the time but which was

expiring in September 2003, *id.* ¶¶ 65-66.

In response, Defendants stress these points.  First, with respect to O&M work on FOB-8,

Defendants emphasize that (1) FOB-8 is a facility that PM Services did not service at any time; (2)

Scott Taylor does not work with FOB-8; and (3) Odoi-Atsem had learned of and had set his sights

on FOB-8 months before meeting O'Shea.  *See* Defs.' Resp. ¶ 57 (citing Defs.' Mot. for Summ. J.,

Ex. 3 (O'Shea Dep.) at 133:14-16, 191-200; Pl.'s Mot. for Summ. J., Ex. B (Odoi-Atsem Dep.) at

48-49; Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 72:12-13); *see also* Defs.' Mot. for Summ.

J., Ex. 3 (O'Shea Dep.) at 132-33 (testifying that Odoi-Atsem raised the possibility of FOB-8 with

23

him at their second meeting in mid-May, and that Taylor was not the source of this information);

Defs.' Resp. ¶ 58 (noting that FOB-8 had been vacant for months during the relevant time period,

and it was public knowledge that a contract for O&M services for the building was available).

Second, with respect to RWA work, Defendants emphasize that while Scott Taylor admitted

discussing RWA work with O'Shea, he remembered speaking to O'Shea only as a representative of

PM Services, such that RWA work opportunities would be passed along to PM Services.  *See* Defs.'

Resp. ¶ 60 (citing Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 61:6-11, 71-72); *but see* Defs.'

Resp. ¶¶ 59, 63 (Taylor's testimony is somewhat in conflict with O'Shea's testimony on this point,

as O'Shea believed that his "May 23 e-mail referenced a call from Taylor about RWA work that

Taylor wanted OAI to perform," but O'Shea assumed that Taylor – aware of O'Shea's interest in

working with Odoi-Atsem – just wanted him act as a go-between and pass this information on to

OAI, which had been out of reach at that particular moment).  Moreover, Defendants also contend

that

> [t]here is no evidence that O'Shea usurped, intercepted or otherwise diverted from
> PM Services any corporate opportunity – RWA or otherwise – for the benefit of OAI
> or any other entity or individual.  Nor is there any evidence identifying RWA work
> or substantiating that any such RWA work, in fact, ever went to OAI.  At most the
> evidence demonstrates that GSA had determined that OAI – not PM Services – was
> the preferred service provider for an unidentified RWA project and asked that
> O'Shea let OAI know about it.

Defs.' Resp. ¶ 60.

Third, with respect to the upcoming contract for O&M work on the Cohen & Switzer

buildings, to replace the expiring contract that PM Services previously held, Defendants stress that

the contract was never a topic of discussion until after O'Shea's ultimate resignation from PM

Services.  *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 151:11-13, 152, 177-78, 196:15-

19 (testifying that "the first meeting I had with Mr. Taylor about the Cohen and Switzer contract

24

happened sometime in August of 2003," well after O'Shea had resigned from PM Services); *id.*, Ex.

9 (Taylor Dep.) at 61, 71-72 (testifying that he never discussed with O'Shea procuring O&M work

for another company while O'Shea was employed by PM Services); Pl.'s Mot. for Summ. J., Ex. B

(Odoi-Atsem Dep.) at 58:2-12 (testifying that as of May 23, 2003, he and O'Shea had not discussed

"the potential of obtaining the Cohen and Switzer contract for [OAI]" and that once the possibility

of obtaining the contract materialized, he and O'Shea "were not looking forward to that building.  It

was too messy.  So we wanted something smaller.  But I mean I wasn't going to turn – if it became

an opportunity, I wasn't going to turn it away.").

I.       *O'Shea Resigns From PM Services and Joins OAI*

By a letter drafted June 2, 2003, but dated June 4, 2003 (a day of work that O'Shea missed

after calling in sick), O'Shea gave PM Services notice of his resignation, which he noted would be

"effective June 20, 2003."  *See* O'Shea Dep. Ex. 6 (O'Shea's June 4, 2003 Resignation Letter,

addressed specifically to COO Martherus); Defs.' Stmt. ¶ 24; Pl.'s Resp. ¶ 24.  O'Shea's resignation

letter contains words complimentary towards PM Services and Matherus in particular, and informs

them that he "accepted a position that will enhance my career growth and will expose me to

challenges and opportunities which I believe are in my best interest . . . . My decision is irrevocable

and final."  *Id.*

Also on June 2, 2003, O'Shea and OAI entered two agreements:  a short-term services

agreement effective July 14, 2003 (twenty-four (24) days after the conclusion of O'Shea's notice of

resignation) through August 31, 2003, *see* Defs.' Mot. for Summ. J., Ex. 18 (Service Proposal), and

a thirteen (13) month employment contract commencing September 1, 2003, and expiring

September 30, 2004, *see id.*, Ex. 19 (Employment Agreement).  The long-term Employment

Agreement contains an "Exculpatory Clause" allowing O'Shea to leave OAI's employ "within

25

ninety (90) days from [September 1, 2003], in the event that ODOI Associates, Incorporated is

unsuccessful in obtaining a one (1) year operation and maintenance contractual agreement with the

General Services Administration (GSA)." *Id.*, Ex. 19 (Employment Agreement) at 1.

Upon receipt of O'Shea's resignation letter, PM Services' Human Resources Director

Heather Metour (daughter of CEO Carole Metour) left a message on O'Shea's answering machine,

stating *in toto*:

> Hi Bill.  This is Heather Metour calling from PM Services.  We are in receipt of your
> resignation letter and we accept your resignation.  We are looking at the resignation
> as effective immediately.  We will pay you through the 20th.  You have until 3:30
> today to drop off your phone, your phone [sic], your pager, your keys, your badge,
> and your laptop.  If anything is missing from that laptop that is company
> information, rest assured we will come after you legally.  That suff is to be dropped
> off at the AV Courthouse and handed over to Ray Short.  If you cannot do this, you
> need to contact me on my mobile phone at [REDACTED].  Thank you.

Defs.' Mot. for Summ. J., Ex. 20 (Recording of Heather Metour's Phone Message for O'Shea); *id.*,

Ex. 21 (Transcript of Health Metour's Phone Message).  As of the date of his resignation as an

employee of PM Services, O'Shea received pay at the rate of thirty-eight dollars and forty-three

cents ($38.43) per hour and received a quarterly bonus equal to five percent (5%) of his annual

salary based on 2080 hours.  Defs.' Stmt. ¶ 4; Pl.'s Resp. ¶ 4.

Despite Heather Metour's message, PM Services paid O'Shea through June 4, 2003 – not

June 20, 2003.  *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 245-46; Pl.'s Resp. ¶ 27.

Moreover, PM Services did not make contributions on O'Shea's behalf to the Central Pension Fund

for this period.  *See* Defs.' Opp'n, Ex. 3 (Central Pension Funds Records) at 3.  With respect to his

pay for the period between June 5 and June 20, 2003, CEO Metour first testified that "[O'Shea]

should have been paid his vacation pay," Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 255:1-2,

but later reversed herself after a break in the deposition during re-direct, stating that O'Shea should

not be paid for the period – during his vacation or otherwise – because "we felt it was an offset at that point for what he had been doing," *id*. at 278:7-12; *see also* Pl.'s Resp. ¶ 31 (contending that PM Services did not have to pay O'Shea for this period because "he was working for another employer (OAI) and had already resigned at PM Services" in addition to the fact that O'Shea was allegedly "breaching his duty at the time . . . working for its competitor . . . and being paid for contracts and RWA work he diverted from PM Services to OAI during that same period").  On re-cross, Metour testified that she did not know how much vacation pay O'Shea had accrued, or how much of an offset PM Services calculated was appropriate to apply against O'Shea's pay.  Defs.' Stmt. ¶ 32 (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 280-82); Pl.'s Resp. ¶ 32.  It is also undisputed that PM Services did not pay O'Shea any portion of his quarterly bonus, despite the fact that eighty-nine percent (89%) of the quarter had passed.  Defs.' Stmt. ¶ 40; Pl.'s Resp. ¶ 40. According to Plaintiff, there is no record evidence that PM Services had a policy of *pro rata* bonuses to its employees; as such, PM Services disputes that such a policy existed, and claims that it has never paid a *pro rata* bonus to any employee.  Pl.'s Resp. ¶ 40.  In contrast, Defendants stress that Metour admitted that PM Services did not have a policy that required employees to be "present in order to be entitled to payment of bonus[es] earned."  Defs.' Stmt. ¶ 40 (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 250:8-16, 253:16-21, 254:1-6).  It is undisputed that O'Shea was the only PM Services employee receiving a quarterly bonus, and the question of whether an employee had to be "present" with the firm to receive such a bonus had never been previously presented.  *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 248:19-254:7.

     J.     *The 2003 Cohen & Switzer O&M Contract Is Awarded to OAI, Not PM Services*

     Upon the expiration of the options held by the GSA on its 1998 Contract with PM Services to provide O&M services to the Cohen & Switzer buildings in September 2003, GSA awarded a

new O&M contract for the Cohen & Switzer buildings to OAI as a Section 8(a) sole-source

contracting entity beginning in October 2003.  Pl.'s Stmt. ¶ 42; Defs.' Resp. 42.  Upon notification

by the GSA of this decision, PM Services initiated the instant lawsuit, filing a Complaint before this

Court on August 28, 2003.  *Id.*; *see also* Compl.

      Central to PM Services' Complaint is its assertion that "GSA had conveyed to PM Services

that the [2003 Cohen & Switzer O&M] contract would be renewed to PM Services for an additional

term as an 8(a) sole source contract . . . . Thus PM Services had and has an enforceable expectation

that GSA would continue to automatically renew its Cohen & Switzer contract as an 8(a) sole

source provider for three years . . . ." Compl. ¶¶ 16-17.  Plaintiff now agrees that some of this

language is inaccurate; specifically, the 2003 Contract was not a "renewal" contract, like the option

years contemplated in the 1998 Contract.  Defs.' Stmt. ¶ 44; Pl.'s Resp. ¶ 44.  As such, the 2003

Contract following the expiration of the 1998 Contract's option terms "would have been a new

contract," "a 'follow-on' contract to the original 1998 [C]ontract."  Pl.'s Resp. ¶ 44; *see also* Defs.'

Resp. ¶ 36 (noting correctly that the 2003 Contract cannot properly characterized as a "follow-on"

contract either, because the 1998 Contract was awarded competitively as a small business set aside

and not under Section 8(a); when the 1998 Contract expired in September 2003, any new contract

would bear no relationship whatsoever to its predecessor).  However, PM Services stresses that it

was repeatedly informed by the GSA in 2003 that it would be awarded the 2003 Cohen & Switzer

contract, and would have been the recipient of the contract "but for" the actions of Defendants

O'Shea and OAI.  *See* Pl.'s Stmt. ¶ 35; Pl.'s Resp. ¶¶ 44-45.

      1.    <u>Plaintiff's Characterization of the Relevant Events</u>

      According to Plaintiff, "[i]t is undisputed that from January through March 2003, GSA

representatives, including on-site GSA representative Ed Poe and his boss Scott Taylor, repeatedly

told PM Services, including CEO Metour, that GSA intended to award the Cohen and Switzer

contract to PM Services sole-source once the contract expired and that PM Services should begin

working with them to prepare bid specifications for the follow-on contract." Pl.'s Stmt. ¶ 35. As

such, "[a]t the end of April, beginning of May 2003, Metour and Martherus began preparing their

staffing lists and cost proposals for the Cohen & Switzer sole-source follow-on." *Id*. ¶ 36. PM

Services contends that it was not until June 23, 2003 that it was informed by Scott Taylor that the

GSA would not be awarding the 2003 Cohen & Switzer O&M contract to it, but was instead

awarding the contract to OAI. *Id*. ¶ 77. PM Services notes that this turn of events was particularly

shocking, given that "Taylor acknowledges that he had previously told Carole Metour and others at

PM Services that he anticipated extending PM Services contract as Cohen and Switzer after it

expired as a sole-source contract and admitted that he had encouraged Metour to become 8(a)

certified for that purpose." *Id*. ¶ 73 (also contending that Tom Russell, the Cohen & Switzer

contract officer prior to Mike Vrobel and now contractor with GSA for the Cohen & Switzer

buildings, testified that he was told that the 2003 Contract would be awarded to PM Services).

PM Services places particular emphasis on two events that it contends were determinative in

the "switch" to OAI and indicative of the "unlawful" interference of OAI and its employee O'Shea.

First, on May 30, 2003, Odoi-Atsem sent an email entitled "Odoi Associates, Inc - O&M Services"

to Scott Taylor. *See* O'Shea Dep. Ex. 13 (May 30, 2003 Email from Odoi-Atsem to Taylor).

Odoi-Atsem's email states, in relevant part:

> This is an unsolicited memo intended to inform you that Odoi Associates, as part of
> its strategic plan, have started offering operations and maintenance (O&M) services
> for Federal facilities. As you may be aware Odoi Associates is an SBA 8(A)
> certified company that is currently providing other services for GSA.
>
> *We have put together a dynamic group of certified technicians most of whom have*
> *previously or [are] currently working on some of your facilities. Specifically, we*

*would like to inform you that Odoi Associates has hired Mr. William O'Shea and Mr. Charles Wehausen both of whom are DC 1st Class Engineers. They will start working directly for Odoi Associates as of July 14, 2003. These two gentlemen are very skilled engineers and managers. Odoi Associates will therefore appreciate any opportunity from your office to participate in managing some of your facilities.*

*Thanking you in anticipation for your consideration.*

*Id.* (emphasis added); *see also* Pl.'s Stmt. ¶ 70 (contending that Wehausen was "furious" when he learned about the email because he had not been hired by OAI at that time, and was not hired by OAI until September 2003); Defs.' Resp. ¶ 70 (noting two points – first, that Wehausen merely testified that "Knowing me, I wasn't happy," Pl.'s Mot. for Summ. J., Ex. F (Wehausen Dep.) at 88), and, second, that when she discovered this email, Metour immediately corrected Contracting Officer Mike Vrobel and informed him "that the employees were not going to work for him," Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 184); Defs.' Resp. ¶ 69 (pointing out that GSA regularly receives unsolicited proposals, brochures, and memos promoting an entity's contract or business capacity like the one provided by OAI). On a printout of the email is this handwritten notation, presumably from Scott Taylor to Tom Russell at the GSA: "Tom – We need to discuss this - ASAP. Thx – Scott." O'Shea Dep. Ex. 13 (May 30, 2003 email from Odoi-Atsem to Taylor); *see also* Pl.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 62:2-9 (Taylor did not recall the email or his notations). Around this same time, Odoi-Atsem apparently also sent a "brochure" to Scott Taylor at the GSA with a list of its employees and a staffing plan. *See* Pl.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 62-63. While this document was not located during discovery, to the best of his recollection, Taylor testified that it "was a standard company brochure" similar to the "zillions" sent to the GSA that listed at least Odoi-Atsem, O'Shea, and Wehausen as OAI employees.

Second, PM Services claims that a red flag was raised by the fact that on July 18, 2003, after it was clear that OAI was obtaining the 2003 Contract, OAI's submitted proposed staffing and

vendor lists for the contract – prepared by O'Shea – "were entirely made up of then current PM Services employees and PM Services vendors." Pl.'s Stmt. ¶ 78; *see also* O'Shea Dep. Ex. 16 (June 18, 2003 Letter from Odoi-Atsem to Vrobel attaching Staffing Plan and Proposed Vendors List).[2] Defendants, while agreeing with this statement, *see* Defs.' Resp. ¶ 78, note that (1) O'Shea specifically testified that he had not supplied OAI with a list of PM Services employees for use in the bidding process and that he believed GSA directed OAI to submit the resumes of certain PM Services employees whom GSA had identified as employees that it wanted to retain for work in the Cohen & Switzer facilities, *see* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 195:5-12; (2) to satisfy GSA, O'Shea – after his resignation from PM Services – sought and obtained permission from the individuals listed to submit their resumes along with other OAI readiness materials, *id.* at 204-06; and (3) apart from Richard Jones and Mike Barrett, who still work for PM Services, every individual identified on the staffing plan was fired by Carole Metour for reasons wholly unconnected with this litigation, *see* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 49-52, 117-19. *See* Defs.' Resp. ¶ 78 (noting the possibility that one individual listed, John Frykman, might have been fired by Metour because he was interested in working for OAI and talked to others about it, *see* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 49), but the record is very unclear on this point, as the two individuals at PM Services that he allegedly talked with – Barrett and Jones – testified that Frykman did not attempt to convince them to quit PM Services).

 2.      A Review of the Record

A more searching examination of the record adduced by the parties reveals that the events

---

[2] The individuals listed on OAI's June 18, 2003 "Staffing Plan" were O'Shea, Odoi-Atsem, Wehausen, John C. Frykman, Robert A. Keefer, John E. Brown, Michael Barrett, Richard W. Jones, and Ryan O'Shea. *See* O'Shea Dep. Ex. 16 (Staffing Plan).

leading up to the award of the 2003 Contract to OAI are much more nuanced than Plaintiff suggests.
Three points are particularly important to understand in order to convey an accurate depiction of the
relevant events.

First, the representations made to PM Services that it would be awarded the 2003 Contract
are less definite and more contingent than Plaintiff's characterization of the record indicates.
Importantly, PM Services did not have a "written commitment" that GSA would sole-source the
2003 Cohen & Switzer O&M contract to it at the end of the expiration of its competitively bid 1998
contract.  Pl.'s Resp. ¶ 46.  According to Metour herself, the primary support for her expectation that
the GSA would award her the 2003 Contract was its encouragement for PM Services to obtain a
Section 8(a) certification – which it did in June 2001, Pl.'s Stmt. ¶ 12, two (2) years prior to the
expiration of the 1998 Contract.  *See* Defs.' Stmt. ¶ 45.  Metour testified:

> A:      "[T]hey [GSA] were encouraging me to go for [an] 8(a) certification because
>         they really wanted to keep us there, in their minds *I am assuming*, for sure,
>         was to award it [the 2003 contract] sole source to us as an 8(a) company.
>
> *      *      *      *      *      *      *      *      *      *      *      *
>
> Q:      Over the course of time, there were discussions about GSA's encouragement,
>         as you put it, for PM Services to get 8(a) certified.  Anything else []?
>
> A:      That's primarily it.  Informal conversations, verbal support.

Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 80:6-12, 90:3-9 (emphasis).  Jim Butland, PM
Services' Corporate Facilities Manager, also indicated that the GSA's representations to PM
Services were indefinite, tentative, contingent on certain events, and made by individuals without the
ultimate decision-making authority.  Defs.' Stmt. ¶ 46.  Butland testified:

> Q:      I will narrow the question, then, to whether or not in your recollection did
>         Tom Russell ever commit to whatever extent he was able that PM Services
>         would be sole sourced as an 8(a) for the Cohen and Switzer contract?

> A:     Let me think about that one.  The contract was due to be up, I believe, by
> September.  In January of '03 – and it was – it was stated that *we tentatively*
> *plan to use you* as a sole source 8(a) contractor, and we're in the process of
> putting the specifications together.  This is not a – it might not be word for
> word, but you know, *we do not have the authority to commit you to this*,
> but we see no reason why we . . . wouldn't go this route with you because
> you're already there; you're doing a good job, blah, blah, blah.
>
> *        *        *        *        *        *        *        *        *        *        *        *
>
> Q:     Anybody else tell you that?
>
> A:     There was one of his contract specialists . . . Joyce Robinson; she *alluded* to
> it, too, also.  *But again, you know, she doesn't have that – you know, to*
> *make that decision . . . .*
>
> *        *        *        *        *        *        *        *        *        *        *        *
>
> A:     But she would – and she also commented, *Now, you realize this is no*
> *commitment.*

Defs.' Mot. for Summ. J., Ex. 10 (Butland Dep.) at 22:17-22, 23:1-10, 24:1-5, 25:15-16; *compare*

*with* Pl.'s Resp. ¶ 49 (contending that "Butland's testimony makes clear that while the deal was not

done until someone had an actual contract in hand, the expectation of everyone, including GSA, was

that the contract was to be sole-sourced to PM Services").

Tom Russell and Scott Taylor testified similarly, explaining that while they encouraged PM

Services to seek Section 8(a) status to increase the likelihood of an award of the 2003 Contract and

to reduce costs for the GSA, receipt of the 2003 Contract was contingent upon PM Services'

provision of high quality performance during the remainder of the 1998 Contract.  According to

Russell,

> Q:     Were you ever present during any discussions between anybody at GSA and
> any member of PM Services' workforce where GSA indicated an intent to
> sole source the [2003] contract for Cohen and Switzer after the expiration of
> their contract?  Do you understand the question?

33

> A:      Yes, I do.  Yes, they were talking about one time going with PM Services
>         under the 8(a) program, yes.
>
> *       *       *       *       *       *       *       *       *       *       *       *
>
> A:      Yes, because that was our intent to keep on with, you know, PM Services, as
>         long as, you know, performance was satisfactory, and the firm was doing a
>         good job, we have authority to go to an 8(a) contractor.  So if one is there
>         with performance up to an acceptable level, we definitely go with that firm,
>         yes.

Defs.' Mot. for Summ. J., Ex. 11 (Russell Dep.) at 21:6-22, 22:1-4.  Taylor, in his testimony, made

these same distinctions:

> A:      I recommended that they – that they pursue that [Section 8(a) certification].
>         You know, again, this is – we don't have a whole lot of qualified service
>         contractors in the 8(a) area, you know.  I think that is part of my job to try
>         and – you know, at the time they were an extremely well performing
>         company, you know.  I don't know anybody's background or history, but I
>         know that, you know, if somehow you can qualify in that arena, I mean
>         that's a very good thing.
>
> *       *       *       *       *       *       *       *       *       *       *       *
>
> Q:      Was there ever a point after that time that they became 8(a) certified that you
>         communicated to anyone at PM Services that they could expect or that there
>         might be – that they could have an expectation that the contract for Cohen &
>         Switzer would be sole sourced to them after the end of their contract was up
>         in August of 2003?
>
> A:      . . . I'm sure I shared my opinion at the time, and as long as the contract is
>         performing well – . . . that would be a recommendation that I definitely
>         would give – . . . to the contracting officer, who I hope would give it to the
>         SBA.

Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 55:16-17, 56-57.

Second, the individuals who made the "representations" to PM Services that it was likely to

be awarded the 2003 Cohen & Switzer O&M contract under Section 8(a) did not have the authority

to commit the 2003 Contract to PM Services on behalf of the GSA.  Indeed, Carole Metour admitted

that she does not know the process regarding "final authority to award a contract," or where "the

authority lies" in the GSA to award a contract. *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 137:3-12. Tom Russell and Scott Taylor, who are aware of the process, clearly testified that such authority did not lie with them. According to Russell, a consultant to GSA, "I don't have any authority at all over contracts. I am there to assist the contract specialist or the contracting officer when I am requested to do so." Defs.' Mot. for Summ. J., Ex. 11 (Russell Dep.) at 15:9-12. However, in the case of the 2003 Cohen & Switzer O&M contract, Mike Vrobel – the head of contract and procurement for the GSA's District of Columbia Services – did not seek his recommendation, and Russell had no involvement in the ultimate award. *Id.* at 10:1-12, 31:6-13. Taylor likewise testified that he lacked decision-making authority, and, at best, could make recommendations to Vrobel, his superior. Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 58:1-8, 59:6-9. In this case, Taylor was one of the GSA employees that did recommend that OAI was the superior choice for the 2003 Contract; as he explained:

> I think, one, there was a strong staff proposal. Two, our dealings with the President, Ablade, have been very good in the past. He is a very smart, knowledgeable man. And I believe that gave a little extra assurance, even – even in the other services or people that he provides for project management, he's – I don't know, I think our division deals with six different contractors in that arena who provide people for those services. He is the only one that I know of that will get personally involved in a little bit of quality assurance of what his people are doing, and if you have any issues, you can go to him. Nobody else is like that in that kind of field. You know, you got a problem with that person, you either work it out with them or let them go. There is nobody in between to go to help you, you know, work it out. So that – I think that, you know, helped, that helped also.

*Id.* at 51:2-19. Here, it is undisputed that Taylor, along with Contracting Officer Representative Jerome Simmons and Juan McPhail, the Senior Building Manager for the Switzer Building, *see* Pl.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 19:2-12, 19:19-24:1, recommended to Vrobel, an individual who had never met Defendant O'Shea, Defs.' Stmt. ¶ 58, Pl.'s Resp. ¶ 58, that GSA select OAI for the 2003 Cohen & Switzer O&M contract. Vrobel went along with this

35

recommendation.  Defs.' Mot. for Summ. J., Ex. 11 (Russell Dep.) at 10:1-12; *id.*, Ex. 9 (Taylor

Dep.) at 9, 10:1-7, 11- 13-21, 45:7-10 (At the relevant meeting, Vrobel solicited discussion

regarding the award of the 2003 Contract: "[T]he initial opinion was that we did not want to use PM

Services, period.  Next decision . . . do we want to consider using . . . OAI."  Vrobel also stated that

"the reason for not going with PM Services for the sole source contract . . . [was] that they wanted

new blood.").  The award then was approved by the SBA, which had to approve OAI as a Section

8(a) sole-source contract recipient and make a finding that the award "will cause no adverse impact

on another small business concern."  *See* Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 54:2-11,

65:11-22; *id.*, Ex. 23 (July 30, 2003 letter from the SBA to Mike Vrobel) (approving OAI as the

Section 8(a) contractor for the Cohen & Switzer buildings and stating that OAI "has the requisite

capabilities to satisfactorily perform the work" and that "[a] determination has been made that

acceptance of this procurement will cause no adverse impact on another small business concern").[3]

    Third, PM Services understates the subsequent discussions it had with the GSA wherein the

reasons behind the decision to award the 2003 Contract to OAI were discussed.  These discussions

revealed that the quality of PM Services' performance during the five (5) years under the 1998

Contract was a significant factor in its non-award.  As Taylor testified,

> Q:     And so what I guess I am trying to get to is when you say that at that time in
>         that meeting with Mike Vrobel that you did not want to use PM Services,
>         period, had Tony Wehausen and Bill O'Shea stayed on with PM Services
>         would that have also been the case?
>
> A:     If the performance would not have stayed at an upper level, I can't say, you
>         know, we would not have liked to – *would not have recommended staying*

---

[3] PM Services never filed an official grievance with the GSA after it awarded OAI the 2003
Contract, notwithstanding Metour's conviction that Taylor and others acted improperly in the events
leading up to the award.  Defs.' Stmt. ¶ 57 (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at
150-51); Pl.'s Stmt. ¶ 57.

> *with them anyway just because of the performance, you know.*

Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 49:10-20 (emphasis added).  After the award of the

2003 Contract to OAI, Metour asked for a meeting with GSA representatives to discuss the decision.

According to Taylor,

> [W]e actually had a meeting.  Carole asked for a meeting with Mike Vrobel.  Mike
> did not attend.  I think it's just professional courtesy to attend and, you know, speak
> our opinions on these things.  And, you know, I bluntly, opinion as it is, gave my
> opinion on that, that I thought those two, the project manager and the chief, Bill and
> Tony, were the key to her success at Cohen and Switzer and that I did not personally
> feel that, you know, they – herself or Nico [Martherus] – were very effective.

*Id*.  Metour herself admitted that Taylor had previously informed her that "he really trusted Mr.

O'Shea and felt that he had done a terrific job for PM Services and that he was a visionary and so

on."  Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 92:11-15.

K.     *Other Conduct At Issue*

Three other smaller issues need to be briefly touched on before the Court can proceed with

its legal analysis:  (1) O'Shea's and OAI's alleged recruitment of current PM Services employees to

join OAI; (2) alleged disparaging remarks made by O'Shea about PM Services; and (3) accusations

that O'Shea improperly retained PM Services' property after his resignation.

1.     O'Shea's and OAI's Alleged Recruitment of PM Services Employees

Paragraph 29 of PM Services' Complaint alleges: "Additionally, O'Shea, [John] Brown and

Wehausen on behalf of [OAI] attempted to recruit current employees of PM Services, Scott Butler,

Rick Jones, Fred Johnson, Brian Schaffer [sic], David Duringer, Steve Brotherton, Craig Travel,

Mike Wells, Mike Barrett, to work for [OAI]."  Compl. ¶ 29.  John Brown is a former employee of

PM Services and a current employee of OAI.  Defs.' Stmt. ¶ 69; Pl.'s Resp. ¶ 69 (not contesting).

Metour testified that she fired Brown (1) on the basis that he was not qualified for his position and

37

(2) for related budgetary reasons, after which Brown sought and gained employment by OAI.  *Id.* (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 51:17-21, 52:1-6).  Wehausen is also now a former employee of PM Services, having joined OAI in September 2003 after he was terminated by Metour when she concluded that he was taking too long to make up his mind about whether he wanted to stay with PM Services or take another job.  *Id.* (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 117:13-21, 118:1-9).  Of the nine (9) employees listed by PM Services in Paragraph 29 of its Complaint, only one (1) – David Duringer – is no longer with PM Services. Defs.' Stmt. ¶ 68; Pl.'s Resp. ¶ 68 (not contesting).  Mr. Duringer now works with another firm, Johnson Controls, and Mr. Wehausen apparently aided Duringer in his quest for a position there. *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 132:11-21, 133:1.

A review of the record highlights the fact that these individuals were either never recruited at all by OAI, or were recruited by O'Shea only after he had left PM Services.  *See* Pl.'s Resp. ¶¶ 68-84.  In sum:

- Scott Butler: Butler testified that (1) John Brown contacted him after OAI was awarded the 2003 Contract and after PM Services had fired him, because he and Brown are friends; (2) O'Shea offered him a job at OAI after he had left PM Services; and (3) Wehausen never attempted to recruit him.  Defs.' Mot. for Summ. J., Ex. 24 (Butler Dep.) at 11:19-22, 12-14.

- Rick Jones: Jones testified that (1) O'Shea offered him a job at OAI during the September 2003 time period, after he had left PM Services; and (2) neither Brown nor Wehausen tried to recruit him.

- Fred Johnson: Johnson testified that OAI and O'Shea never attempted to recruit him. Defs.' Mot. for Summ. J., Ex. 26 (Johnson Dep.) at 19:19-22, 20:1-8.  Johnson also testified that slightly before Wehausen left PM Services in mid-July 2003 (during a period that Wehausen thought that he was going to work with a company called L-Core and not OAI), Wehausen simply asked him if he was going to continue working for PM Services or whether he would like a position as a maintenance mechanic at OAI.  *Id.* at 15.

- Brian Shaffer: Shaffer testified that (1) neither O'Shea nor Brown ever asked him to

come work with OAI; and (2) Wehausen – besides making the fact that he was "disgruntled" with PM Services prior to his departure – never made any direct overtures either.  Defs.' Mot. for Summ. J., Ex. 28 (Shaffer Dep.) at 13:13-22, 14:1-4, 19:18-22.

•    David Duringer: Duringer worked for PM Services in a temporary position for only two months – between the end of July 2003 and the close of September 2003.  Defs.' Mot. for Summ. J., Ex. 29 (Duringer Dep.) at 11, 21:6-17.  Duringer testified that neither O'Shea, Brown, or Wehausen talked with him about coming to work at OAI nor did they indicate that a job opportunity was available to him.  *Id.* at 17:20-22, 18:1-7, 19:14-20, 20:1.

•    Steve Brotherton: Brotherton testified that he was never recruited by Messrs. O'Shea, Brown, or Wehausen.  Defs.' Mot. for Summ. J., Ex. 30 (Brotherton Dep.) at 15:6-13.

•    Craig Travel: Travel testified similarly, indicating that he was never approached or recruited by O'Shea, Brown, or Wehausen.  Defs.' Mot. for Summ. J., Ex. 31 (Travel Dep.) at 14:5-13.

•    Mike Wells: Wells also testified that he was never recruited by O'Shea, Brown, or Wehausen.  Defs.' Mot. for Summ. J., Ex. 32 (Wells Dep.) at 21:5-21.

•    Mike Barrett: Barrett testified accordingly, indicating that he was never recruited by the OAI team of O'Shea, Brown, and Wehausen.  Defs.' Mot. for Summ. J., Ex. 33 (Barrett Dep.) at 13:12-19.

Similarly, O'Shea testified that he never encouraged any of his subordinates to leave PM Services while he remained employed there.  Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 116:1-9.

2.    Alleged Disparaging Remarks Made by O'Shea About PM Services

Paragraph 25 of PM Services' Complaint alleges that O'Shea breached his duty of loyalty to the company by making "false disparaging remarks about PM Services to its employees and GSA, including but not limited to, that PM Services was not financially viable and could not pay its vendors or employees, in an effort to interfere with PM Services' business and contractual relationship with GSA and PM Services' employees."  Compl. ¶ 25.  According to Metour, these accusations are based solely on second-hand information that she received from the reports of Teresa

39

Simons, a PM Services employee.  Defs.' Stmt. ¶ 88; Pl.'s Resp. ¶ 88; *see also* Defs.' Mot. for

Summ. J., Ex. 1 (Metour Dep.) at 103:8-21, 109:2-5, 110-13 (testifying that she received the

reports from Simons and from perhaps other employees whom she could not – and has never –

named).  PM Services has no evidence independent of Simons' accusations that O'Shea ever

disparaged PM Services in any way.  Both Taylor and O'Shea have denied these accusations, *see*

Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 85:6-14; *id.*, Ex. 9 (Taylor Dep.) at 44:10-22

("Bill never talked poorly, you knew, he is quite the gentleman . . . . I don't recall anything

derogatory.  Actually their staff was quite good with that . . . they are quite the . . . professional

gentlemen.").

PM Services' allegations flow out of a memorandum constructed by Teresa Simons on

August 1, 2003 – roughly two (2) months after O'Shea had left the employ of PM Services.  *See*

Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 1 (Aug. 1, 2003 Memo from Simons to

Metour).  Ms. Simons had been hired as PM Services Production Control Clerk, a position akin to

an administrative assistant, in May 2003 at PM Services' Franconia Warehouse Complex.  Pl.'s

Mot. for Summ. J., Ex. H (Simons Dep.) at 19-20, 45-49.[4]  Ms. Simons testified that she constructed

---

[4] Defendants focus on the fact that "[o]ne month after being hired as the Production Control
Clerk – a position that Simons testified is akin to an administrative assistant – and after notifying
Metour of what she believed she had overheard, Simons was promoted to Project Manager and given
an eighty-two per cent (82%) raise (from seventeen dollars ($17) to thirty one ($31) dollars per
hour), followed shortly by another raise to thirty-three ($33) dollars per hour, an overall increase of
eighty-nine per cent (89%) of her original pay within approximately one month of her hire."  Defs.'
Stmt. ¶ 38 (citing Defs.' Mot. for Summ. J., Ex. 22 (Simons Dep.) at 20-21).  Based on these facts,
Defendants argue that her memorandum is inherently "unreliable," and imply that PM Services in
some way improperly influenced her to create "false" allegations about O'Shea to support their legal
theories.  *See* Defs.' Reply to Pl.'s Opp'n ("Defs.' Reply") at 10 & n.2.  While Defendants' theory
may well be accurate, this kind of credibility determination regarding a witness and a piece of
evidence is best left for a fact-finder, not the Court on a summary judgment motion wherein it must
draw inferences in favor of the non-moving party when they are supported by admissible evidence.
As such, the Court shall not factor in what may well be the possible inherent unreliability of Ms.

her memorandum based solely on conversations she overheard O'Shea having on the telephone

through the wall while she was working on her computer in the adjoining office.  *See id.* at 42:13-

44:4.  In relevant part, Ms. Simons' memorandum states:

> At first Mr. O'Shea seemed to be honest and concerned for the company and wanted what was best, but he would talk on the phone to other people and it was quite the opposite.

> William O'Shea mentioned to each of us, at the Franconia location, that we should leave this company, so PM Services would loose [sic] their contract because no one else would be able to find themselves around here and be able to keep this job running properly.

> He also said on numerous occasions, that we could not even get supplies because they did not pay their bills, and all their accounts were closing.  That had to be a lie because I have not had any problems with any supply houses, and I have contacted quite a few.

> With everything that I could hear going on there was no doubt that he was looking for backing (money wise) to join a partnership or to get a percentage of the profit from another company that he was setting up with a man named La'Bladae (may be misspelled) [apparently Ablade Odoi-Atsem] and a man named Tony (he never mentioned his last name) [Wehausen].

> Mr. O'Shea realized that I could hear everything, and he told me not to mention any thing I heard to any one else, and that if I did mention it to anyone, that he would strictly deny any wrong doings.  He also made it a point to let me know that nobody would believe me because he had worked for this company for a long time, and he built this company, and it would never survive without him.

> Mr. O'Shea said that if any one from PM Services called for him when he was not here on the compound, to tell them that he was out on the floor.  He was almost always late coming in and early leaving, I can't recall him ever getting over six hours a day in.  I also know that he took a copy of all deliverables and forms on a CD that Ray Short had sent me, he told me to make sure I copied of [sic] everything I would need for this job.

> Mr. O'Shea said that him and Tony [sic] were going into there [sic] own business with another man and he also mentioned that he had every record for each job around so they would be taking over all of PM Services['] jobs.  He knew how much

_____

Simons herself when considering the record before it for the purposes of the pending motions.

each job was bid and how much it took to run each job.  He said that he had kept all kinds of records from years back and that his garage was full of records.

I started taking notes on quite a few things that was [sic] said, and some names that was [sic] mentioned, so you [Metour] could look into them for your self, but I got rid of them since you came up to this area.

Pl.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1-2.

During her deposition, Ms. Simons testified that "it was obvious" that O'Shea was trying to start his own business because O'Shea had shared with her that he was interested in doing so and asked that she not share that with other people; however, she admitted that she did not know that O'Shea in fact had not started his own business.  Pl.'s Mot. for Summ. J., Ex. H (Simons Dep.) at 44, 45:22, 46:1-17.  Moreover, Simons made several concessions in her deposition testimony:  (1) she was not a party to any of the overheard conversations; (2) she based her conclusions solely on what she was capable of overhearing from the next room separated by a wall; (3) she had "no idea" with whom O'Shea might have been speaking on the telephone; (4) she did not recall any specifics about what she had heard; (5) she "knew it was impossible" for O'Shea to take over PM Services' contracts and "bring them down"; (6) if O'Shea did make such a comment, "he was just puffing"; (7) despite the fact that she told Metour that O'Shea was "looking for backing (money-wise) . . .," he – in fact – had never said that and that she had just "assumed" that was the case; and (8) for all she knew, O'Shea could have been making reference to financing a house, which he was doing at that time.  Pl.'s Mot. for Summ. J., Ex. H (Simons Dep.) at 43, 46:16-18, 49:11-16, 53:8-10, 64:1-2, 64:11-22, 65:1-5, 65:20-22, 77:8-16; *see also* Defs.' Mot. for Summ. J., Ex. 2 (O'Shea Aff.) ¶ 11.  This exchange also occurred in Simons' deposition:

Q:      So he was on the phone making plans for the future?

A:      Right.  I guess so.

Q:      Are you certain?

A:      Nope.

Q:      Are you assuming?

A:      I'm assuming.

*Id.* at 68:2-7.

As far as the actual truth of the content of the alleged statement, i.e., that O'Shea stated that

PM Services "could not even get supplies because they did not pay their bills, and all their accounts

were closing," Pl.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1, Metour

admitted during her deposition that (1) she did not know if PM Services had ever bounced an

employee paycheck; (2) "it was a possibility" that PM Services had previously been reduced to a

cash-only basis with a vendor due to credit problems; and (3) it was "a possibility" that PM

Services' payments to vendors were late at times.  *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour

Dep.) at 106-08; *see* Pl.'s Resp. ¶ 89 (disputing that "if O'Shea is admitting that he made the

comments alleged in the Complaint, that they were somehow true" but providing no evidence or

citation to the record to show that such comments would be untrue).  O'Shea testified that when new

PM Services' employees expressed a concern whether the company was stable, he would tell them

that "[t]he one thing you can count on with PM Services is that they always – you will always have

your paycheck, that's top priority for the company.  And I said that the only time we have ever had

any trouble is we have struggled with, you know, paying vendors on time."  Defs.' Mot. for Summ.

J., Ex. 3 (O'Shea Dep.) at 85:6-14.  O'Shea further testified that PM Services had bounced his

paycheck, but only once due to a clerical error, and noted that – although he did not share this with

his co-workers and only discussed the issue with the corporate brass – he became aware of at least

two (2) incidents of vendors either placing PM Services on a cash-only purchasing basis or refusing

to extend credit for supplies and equipment.  *Id.* at 82-84.

3.    Accusations that O'Shea Improperly Retained PM Services Property After His Resignation

The final accusation relevant to this suit is PM Services' contention that "O'Shea . . . removed or had copied PM Services operations and business materials prior to O'Shea resigning his employment."  Compl. ¶ 30.  When examined regarding this allegation, Metour testified that (1) "Mr. O'Shea did have a lot of PM Services material and documents in his possession because of his role in the company"; (2) it was possible that O'Shea worked from his home; and (3) the accusation was based upon what Ms. Simons "was overhearing."  Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 133-35.  In her deposition, Ms. Simons testified that O'Shea took "a copy of all deliverables and forms on a CD that Ray Short had sent [her]."  Pl.'s Mot. for Summ. J., Ex. H (Simons Dep.) at 73:17-74:10.  Simons also conceded that (1) she was unaware that O'Shea's position called for him to have PM Services' materials and documents in his possession; (2) she was unaware if O'Shea worked out of his house; and (3) if O'Shea did work out of his house, it would not have been unusual for him to have records there.  *Id.* at 75:16-20, 78:5-12.  O'Shea has stated that he "routinely worked out of [his] home office, in New Market[, Maryland], mostly in the evenings and on the weekends."  Defs.' Mot. for Summ. J., Ex. 2 (O'Shea Aff.) ¶ 7.  O'Shea also testified that he had his son – then also an employee of PM Services – drop off his common property at the A.V. Bryan United States Federal Courthouse as instructed by Heather Metour in her recorded message on his answering machine.  Defs.' Stmt. ¶ 29 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 140:19-22, 141:1-14); Pl.'s Resp. ¶ 29 (not disputing this fact).[5]

---

[5] PM Services does make reference to what were apparently more documents retained for a period by O'Shea.  *See* Pl.'s Resp. ¶ 95 ("Moreover, the undersigned [attorney] was forced to write a letter to the opposing counsel to obtain a box of documents O'Shea had removed following his

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202  (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require

---

resignation that he had in his garage. Only after this letter were all of the items returned."). However, Plaintiff does not attach the referenced letter, does not provide a date for this exchange, and nowhere describes what was in the "items returned" as a result of this letter.

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If

the evidence is merely colorable, or is not sufficiently probative, summary judgment may be

granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere

allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper

motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The

adverse party must do more than simply "show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of

identifying those portions of the record that demonstrate the absence of a genuine issue of material

fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is

a *genuine issue for trial*.'" *Id*. at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in

original).

### III: DISCUSSION

Three major claims are currently before the Court for its resolution: (1) PM Services' claim

that O'Shea breached his fiduciary duty of loyalty to the company by usurping its contractual and

corporate opportunities while still its employee, *see* Compl. ¶¶ 33-36 (Count I - Breach of Duty of

Loyalty); (2) PM Services' assertion that O'Shea and OAI tortiously interfered with its contract and

business relations, *id*. ¶¶ 37-42 (Count II - Tortious Interference); and (3) Defendants' two related

counterclaims, which contend that (a) PM Services violated D.C. Code § 13-1303 when it failed to

pay O'Shea's base and bonus wages during the leave period immediately prior to his resignation,

and (b) PM Services violated O'Shea's pension rights when it failed to make payments and/or

contributions due on his behalf, *see* O'Shea's Answer & Countercl. ¶¶ 21-23 (Count I - Violation of

D.C. Code § 32-1303), ¶¶ 24-27 (Violation of Pension Rights). The Court shall conduct a detailed

examination into each contention in turn.  The Court shall then conclude by addressing one final

issue – Defendants' assertion that PM Services has failed to demonstrate that it sustained damages

as a result of Defendants' alleged conduct.  *See* Defs.' Stmt. ¶¶ 99-125.

A.      *Breach of the Fiduciary Duty of Loyalty*

Plaintiff PM Services contends that Defendant O'Shea misused his position while employed

with the company from May 2003 forward by using his contacts garnered from PM Services and its

non-public proprietary information to usurp the contractual and corporate opportunities of PM

Services for himself and OAI in violation of his duty of loyalty.  *See* Pl.'s Mot. for Summ. J. at 3.  In

contrast, Defendants contend that, upon analysis of the present record, it is clear that O'Shea simply

"put his feelers out" during his time with PM Services and never solicited the clients, customers, and

employees of PM Services during his time there, never defamed the company, and never retained

property that belonged to the company.  *See* Defs.' Opp'n at 5-9.

Multiple recent cases in this jurisdiction have applied the common law principles and

limitations of agency law into the field of corporate employment.  *See, e.g.*, *Furash & Co. v.

McClave*, 130 F. Supp. 2d 48 (D.D.C. 2001); *Riggs Inv. Mgmt. Corp. v. Columbia Partners*, 966

F. Supp. 1250 (D.D.C. 1997); *Mercer Mgmt. Consulting v. Wilde*, 920 F. Supp. 219 (D.D.C.

1996).  Under this application, it has been established that employees – especially managers,

corporate officers, and directors – "owe 'an undivided and unselfish loyalty to the corporation' such

that 'there shall be no conflict between duty and self interest.'" *Mercer*, 920 F. Supp. at 233

(quoting *Guth v. Loft*, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939); *see also* Restatement (Second) of

Agency § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely

for the benefit of the principal in all matters concerned with his agency.").  Ultimately, "'an agent is

subject to a duty not to compete with the principal concerning the subject matter of his agency.'" *Id.* (quoting Restatement (Second) of Agency § 393).  An agent has "a duty to act solely for the benefit of his employer and to avoid conflicts of interest between his duty to his employer and his own self-interest."  *Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265 (citations omitted).

However, while "concern for the integrity of the employment relationship has led courts to establish a rule that demands of a corporate officer or employee an undivided and unselfish loyalty to the corporation," *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 568 (1978), "there is an off-setting policy 'recognized by the courts . . . of safeguarding society's interest in fostering free and vigorous competition in the economics sphere,'" *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 963 (Del. 1980) (quoting *Maryland Metals*, 382 A.2d at 569).  "[T]he law is clear that 'an agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done his principal.'" *Mercer*, 920 F. Supp. at 233 (quoting *Sci. Accessories Corp.*, 425 A.2d at 962).  In general,

> [e]ven before the termination of the agency, [an employee] is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein.  Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete.

*Id.* (quoting Restatement (Second) of Agency § 393 comment e).

However, an employee's "privilege to compete is limited."  *Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265.  "'The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty.'" *Sci. Accessories Corp.*, 425 A.2d at 965 (quoting *Maryland*

48

*Metals*, 382 A.2d at 569-70).  An employee's proper preparatory activities have been delineated as

such:

> Prior to termination of employment, an officer may not solicit for himself or herself business which the position requires the employee to obtain for the employer.  The officer must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts on behalf of his employer.

*Mercer*, 920 F. Supp. at 234 (quoting William W. Fletcher, Fletcher Cyclopedia of the Law of

Private Corporations § 856 (perm. ed. rev. vol. 1994)).  "In preparing to compete, an employee may

not commit wrongful acts, 'such as misuse of confidential information, solicitation of the firm's

customers, or solicitation leading to a mass resignation of the firm's employees.'" *Furash*, 130 F.

Supp. 2d at 53 (quoting *Mercer*, 920 F. Supp. at 234); *see also Sci. Accessories*, 425 A.2d at 965

(noting that "[e]xamples of misconduct which will defeat the privilege" to make arrangements to

compete include "misappropriation of trade secrets"; "misuse of confidential information";

"solicitation of employer's customers prior to cessation of employment"; "conspiracy to bring about

mass resignation of employer's key employees"; and "usurpation of employer's business

opportunity").  "At the same time, failure to disclose plans to enter into competition is not itself

necessarily a breach of fiduciary duty."  *Mercer*, 920 F. Supp. at 234.  Ultimately, various courts

have recognized that "[t]he ultimate determination of whether an employee has breached his

fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded

upon a thoroughgoing examination of the facts of the particular case." *Furash*, 130 F. Supp. 2d at

53; *Mercer*, 920 F. Supp. at 234; *Maryland Metals*, 382 A.2d at 570; *Sci. Accessories*, 425 A.2d

at 965; Fletcher Cyclopedia Corporations § 856.

　　　　Upon an analysis of the factors identified by the *Mercer* and *Science Accessories* courts in

the context of the factual record adduced by the parties, the Court concludes that a genuine issue of

material facts exists concerning whether O'Shea stepped over the line between privilege and loyalty,

and breached his fiduciary duty to PM Services.  As such, Plaintiff's Motion for Summary Judgment

as to Count I of its Complaint must be denied, and Defendants' corresponding Motion for Summary

Judgment as to this point also must be denied.  The following considerations are relevant to the

Court's conclusion.

>       1.      Misappropriation of Confidential and/or Proprietary Information

It is clear that when an employee misappropriates a firm's confidential and/or proprietary

advantage for his own personal advantage, the employee has breached his duty of loyalty to his

employer.  *See Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265 (CEO shared confidential

information about employee wages and client fees to prospective employer in violation of duty of

loyalty); *see also North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) ("an

agent has a duty not to use confidential knowledge acquired in his employment in competition with

his principal") (internal quotation marks omitted).  Here, the strongest evidence currently before the

Court that O'Shea misappropriated confidential information is Teresa Simons' August 1, 2003

Memorandum and her subsequent testimony that O'Shea – prior to leaving PM Services – "took a

copy of all deliverables and forms on a CD that Ray Short had sent [her]" and "mentioned that he

had every record for each job around so [OAI] would be taking over all of PM Services['] jobs"

because OAI would then know "how much each [PM Services'] job was bid and how much it took

to run each job."  *See* Pl.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1-2.

However, the factual record is quite unclear if – and when – O'Shea returned this material, which

apparently was in his garage.  *See supra* Section II(K)(3).  Some of the information frequently

identified by Plaintiff as "proprietary information," such as the details of its GSA contracts and an

identification of its employees, subcontractors, and vendors, *see* Pl.'s Stmt. ¶ 29, are listed in GSA

contracts and maintained as a public record. They cannot, therefore, be considered "confidential" information. However, PM Services' pricing and bidding information is confidential and proprietary information. In this case, it is simply unclear based on the present record: (1) what PM Services' documents O'Shea had personal possession of and/or access to during May 2003 and beyond; (2) what confidential proprietary knowledge could have been gleaned by O'Shea during his limited participation in PM Services' bids, *see* Section II(D); and (3) how such documents or knowledge was used, if at all, during the conversations leading up to O'Shea's joining of OAI and in OAI's subsequent bids.

### 2.   Solicitation of Employer's Employees Leading to a Mass Resignation

Solicitation leading to a "mass resignation" of the firm's employees will also lead to a breach of an employee's fiduciary duty. *See Mercer*, 920 F. Supp. at 234; *Sci. Accessories*, 425 A.2d at 965; *see also Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265 (finding a violation of duty of loyalty where outgoing CEO "pre-solicited employees, though these pre-solicitations were generally close to his departure"). A review of the record demonstrates that PM Services cannot establish a breach of fiduciary duty by O'Shea on this point. The only major evidence suggesting that O'Shea advocated that his fellow employees leave PM Services while he was still in its employ is (1) Teresa Simons' August 1, 2003 Memorandum, which states "William O'Shea mentioned to each of us, at the Franconia location, that we should leave this company, so PM Services would loose [sic] their contract," Pl.'s Opp'n, Ex. 1 (August 1, 2003 Memo from Simons to Metour) at 1, and (2) an argument by inference that O'Shea cajoled Wehausen into considering working for OAI during May 2003 – although the only evidence on this point is that Wehausen was also "pretty fed up with the way things were going" at PM Services, *see* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 110:21-22, 111:1-8, and willingly attended all meetings in May 2003 with Odoi-Atsem on his own

accord.  As detailed by the Court, *see supra* Section II(K)(1), the nine (9) employees identified in

Plaintiff's Complaint – Scott Butler, Rick Jones, Fred Johnson, Brian Shaffer, David Duringer,

Steve Brotherton, Craig Travel, Mike Wells, and Mike Barrett, *see* Compl. ¶ 29 – were either never

recruited at all by O'Shea and OAI, or were only recruited after O'Shea left PM Services.  Even

assuming *arguendo* that PM Services' employees were recruited by O'Shea while he was still

employed by PM Services, there has certainly been no "mass resignation" of the type necessary to

establish liability.  As such, at this point, PM Services could not succeed under a "mass resignation"

breach of fiduciary duty theory, while a genuine issue of material fact would exist under a "misuse

of confidential information" theory.  However, other types of "wrongful acts" must still be

considered before turning the page on this issue.

### 3.    Solicitation of an Employer's Customers and/or Business Opportunities

Solicitation of an employer's customers prior to cessation of employment will also trigger a

violation of an employee's fiduciary duty of loyalty.  *See Furash*, 130 F. Supp. 2d at 53; *Sci.*

*Accessories*, 425 A.2d at 965; *see also Mercer*, 920 F. Supp. at 234 (finding it "unreasonable and

unrealistic that any client contact prior to leaving one's employment and starting a competing

business constitutes a breach of one's fiduciary duty" and requiring "overt solicitation" or "other

improper actions taken in the course of defendants' client contacts" to establish a claim).  As noted

previously, the *Mercer* court emphasized that "[p]rior to termination of employment . . . [the

employee] must refrain from actively and directly competing with the employer for customers and

employees, and must continue to exert his or her best efforts on behalf of his employer."  *Mercer*,

920 F. Supp. at 234; *see also Am. Fed. Group, Ltd. v. Rothenberg*, Civ. No. 91-7860(THK), 2003

WL 22349673, at *10 (S.D.N.Y. Oct. 14, 2003) ("It follows when an employee . . . solicits the

customers of a current employer and diverts the employer's business to himself, he breaches his

fiduciary duty to his employer."); *Ticor Tile Ins. Co. v. Cohen*, Civ. No. 98-4001(JSM), 1998 WL

355420, at *4 (S.D.N.Y. July 2, 1998) (evidence that employee, prior to his resignation, asked

clients to follow him to another company, or whether they would be willing to follow him elsewhere,

established breach of fiduciary duty).

Likewise, solicitation of an employer's business opportunities prior to termination of

employment will also constitute a breach of the outgoing employee's fiduciary duty of loyalty. "The

doctrine of 'corporate opportunity' provides that corporate fiduciaries and employees cannot,

without consent, divert and exploit for their own benefit any opportunity that should be deemed an

asset of the corporation." *Rothenberg*, 2003 WL 22349673, at *12 (citations and quotation marks

omitted). "Briefly summarized, the law is that if a business opportunity is presented to a corporate

executive, the officer cannot seize the opportunity for himself if: (a) the corporation is financially

able to undertake it; (b) it is within the corporation's line of business; (c) the corporation is

interested in the opportunity." *Sci. Accessories*, 425 A.2d at 963 (citations omitted).[6] A corporate

opportunity is one in which the corporation has an "interest" or "tangible expectancy," which can be

explained as "something much less tenable than ownership, but, on the other hand, more certain than

a desire or a hope." *Rothenberg*, 2003 WL 22349763, at *12 (citation omitted). "The degree of

likelihood of realization from the opportunity is, however, the key to whether an expectancy is

tangible." *Id.* (quoting *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 89 (2d Cir.

1973)).

---

[6] A "corollary" of this rule is that "when a business opportunity comes to a corporate officer,
which, because of the nature of the opportunity, is not one which is essential or desirable for his
corporation to embrace, being an opportunity in which it has no actual or expectant interest," then
the officer or employee "is entitled to treat the business opportunity as his own and the corporation
has no interest in it, provided the officer has not wrongfully embarked the corporation's resources in
order to acquire the business opportunity." *Sci. Accessories*, 425 A.2d at 963.

A review of the record demonstrates that through roughly May 21, 2003, O'Shea's conduct had not risen to a level that threatened his fiduciary duty of loyalty; rather, O'Shea's actions constituted permissible "feelers," plans, and arrangements for his post-PM Services' employment. *See Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265 (noting that having "basic meetings" and sending out "'feelers' to possible investors is insufficient to "breach the fiduciary duty of loyalty"). As of this time, O'Shea had conversed several times with Taylor for short periods of time regarding his future plans; met with Odoi-Atsem and Wehausen on two separate occasions to discuss their compatibility, the possible structure of any alliance between the men, and hammer out compensation issues; and met with Section 8(a) sponsors who might be interested in partnering with an expanded OAI. The alliance was still very tentative and uncertain, with internal negotiations as the centerpiece of all contact. *See* O'Shea Dep. Ex. 8-9 (May 20, 2003 Email from O'Shea to OAI) (O'Shea signs off the email by suggesting, "Let me know if you wish to continue.").

However, O'Shea's conduct is open to an inference that could support PM Services' theory after May 22, 2003. In a May 23, 2003 email to OAI, O'Shea details a "phone call from Scott [Taylor] yesterday evening." O'Shea Dep. Ex. 11 (May 23, 2003 Email from O'Shea to OAI). O'Shea then notes that "[w]e are going to get together next week to discuss an opportunity that has recently surfaced." *Id.* According to O'Shea, Taylor emphasized that "timing is becoming increasingly critical. He cautioned me that if the offer goes out to another Company than [sic] there will be nothing that we can do to retrieve it." *Id.* O'Shea concludes by reminding Odoi-Atsem that "[a]ll we need to do is let him know that we are proceeding with our alliance and we can secure this excellent opportunity." *Id.* Further questions arise regarding O'Shea's conduct in his May 30, 2003 email to Odoi-Atsem, which could support a theory that O'Shea was soliciting business opportunities on behalf of OAI while still employed with PM Services, and originally had planned to

54

remain with PM Services until OAI had officially secured these opportunities.  *See* O'Shea Dep. Ex.

12 (May 30, 2003 Email from O'Shea to OAI) ("If you remember correctly, when we had our

initial meetings Tony and I were going to remain with PM Services until the final hour.  We were

later told by Scott that it would be necessary for Tony and I to resign from our current employer, in

order for us to be awarded our first contract.").  O'Shea's conduct is again open to an inference

supporting PM Services' theory in light of his assertion that he drafted his notice of resignation from

PM Services on June 2, 2003, *see* Defs.' Stmt. ¶ 24, but, by May 30, 2003, OAI was representing –

without his objection, unlike Wehausen – that he had been hired and was using his stature to

promote itself to the GSA, *see* O'Shea Dep. Ex. 13 (May 30, 2003 Email from Odoi-Atsem to

Taylor).

Despite this evidence, summary judgment cannot be granted on this issue, as several gaps in

the record remain which prevent either party from establishing the true extent of O'Shea's actions

vis-á-vis his fiduciary duty to PM Services.  PM Services has consistently asserted that O'Shea's

conduct constituted solicitation of one of its customers – i.e., the GSA – and usurpation of three of

its business opportunities, including (1) its RWA work, (2) O&M work for the FOB-8 building, and

(3) the upcoming 2003 Cohen & Switzer contract.  *See* Pl.'s Mot. for Summ. J. at 4.  Based on the

present record, certain issues prevent the Court from definitively concluding that O'Shea's actions

fit with PM Services' characterization.

First, with respect to RWA work, which certainly was a business of PM Services following

the creation of its "Technical Services group" in November 2002, O'Shea's conduct on behalf of

OAI while he was still employed with PM Services remains unclear.  Scott Taylor did not recall

discussing RWA work with O'Shea except in O'Shea's capacity as a PM Services' representative

until his resignation, such that O'Shea would pass the information along to PM Services.  *See* Defs.'

Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 61:6-11, 71-72.  In contrast, O'Shea does remember

discussing RWA work with Taylor that would be directed to OAI, and not PM Services; indeed,

O'Shea has identified the "excellent opportunity" discussed in his May 23, 2003 email to Odoi-

Atsem as RWA work.  *See* Defs.' Resp. ¶¶ 59, 63.  However, O'Shea testified that Taylor contacted

him regarding this information because Odoi-Atsem – the intended recipient of the information –

could not be located at that time, and Taylor simply wanted him to act as a go-between since he was

in better contact with Odoi-Atsem.  *Id*.  With no further information presently before the Court as to

this issue, but providing each party (as corresponding non-moving parties) the proper inferences in

light of a summary judgment motion, the Court must conclude that a material issue of disputed fact

remains as to O'Shea's promotion of RWA for OAI while he was still at PM Services, and his

alleged diversion of that work to OAI.

     <u>Second</u>, with respect to O&M work for the FOB-8 building, O'Shea has admitted that this is

certainly the same kind of work that PM Services did.  *See* Pl.'s Stmt. ¶ 58 (citing Defs.' Mot. for

Summ. J., Ex. 3 (O'Shea Dep.) at 185).  In deposition, O'Shea implied that some discussions had

occurred in late May 2003 – while he was still employed by PM Services – regarding the possibility

that OAI obtain O&M work for the FOB-8 building.  *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea

Dep.) at 132-136 (O'Shea notes that "there [were] no conversations about any contract that I was

aware of other than FOB-8 at that point in time").  However, two points prevent the Court from

finding that O'Shea violated his fiduciary duty to PM Services with respect to O&M work at the

FOB-8 building.  First, the record is unclear as to the extent of O'Shea's involvement in the FOB-8

debate while he was still employed by PM Services:  (1) the FOB-8 is a facility that PM Services did

not service at any time; (2) Scott Taylor did not work with FOB-8; (3) Odoi-Atsem testified that he

learned of and set his sights on FOB-8 months before meeting O'Shea; (4) Taylor testified that he

was not the source of this information, and it was raised by Odoi-Atsem at their second meeting as a

possibility for the business; and (5) the building had been vacant for several months and the

possibility of O&M work there was public knowledge.  *See* Defs.' Resp. ¶¶ 57-58.  Second, the

record is also unclear as to the extent of PM Services' interest in FOB-8.  As the *Rothenberg* court

noted, in order for a company to have a "corporate opportunity" at issue, the corporation must have

something "more certain than a desire or a hope;" moreover, "the key to whether an expectancy is

tangible" is "[t]he degree of likelihood of realization from the opportunity."  *Rothenberg*, 2003 WL

22349673, at *12.  While PM Services focuses on the fact that O&M work for the FOB-8 building

would be "the same kind of work PM Services did," Pl.'s Stmt. ¶ 58, such an assertion is insufficient

to meet the "corporate opportunity" test described in *Rothenberg*.  Simply, based on the present

record, the Court cannot conclude (1) that PM Services did have an interest in obtaining O&M work

for the FOB-8 building, and it was somewhat likely that it would accomplish such an interest, or (2)

that O'Shea played a role in redirecting the opportunity to OAI while he was still employed by PM

Services.  As such, a genuine issue of material fact remains.

  Third, with respect to the 2003 O&M contract for the Cohen & Switzer buildings, which

appears to be the central focus of this suit, the record is simply inconclusive at this time as to

O'Shea's involvement with redirecting the contract to OAI while he was still employed by PM

Services.  Here, Taylor, O'Shea, and Odoi-Atsem have each testified that the 2003 Contract was

never a topic of discussion until after O'Shea's ultimate resignation from PM Services.  *See* Defs.'

Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 151:11-13, 152, 177-78, 196:15-19; *id.*, Ex. 9 (Taylor

Dep.) at 61, 71-72; Pl.'s Mot. for Summ. J., Ex. B (Odoi-Atsem Dep.) at 58:2-12.  In contrast, read

in the light most favorable to Plaintiff and in the context of the events of the Spring and Summer of

2003, the emails sent by O'Shea and Odoi-Atsem while O'Shea was still employed by PM Services

could be read to discuss obtaining the 2003 Cohen & Switzer contract for OAI.  Indeed, O'Shea's May 23, 2003 email discussing an "excellent opportunity" might have been referring to the Cohen & Switzer contract, and the fact that "timing" was "critical" to prevent the offer from "go[ing] out to another Company" supports this idea – if OAI got organized and properly submitted its application to the GSA as a Section 8(a) company before a competitive bidding process occurred, it could be sole-sourced the contract; however, if it waited, it might miss out on the opportunity in a competitive bid situation given its size and relative inexperience in the O&M field.  *See* O'Shea Dep. Ex. 11 (May 23, 2003 Email from O'Shea to OAI).  Odoi-Atsem's May 30, 2003 email to Scott Taylor of the GSA, representing that OAI had hired O'Shea and Wehausen, might have been an effort to secure the 2003 Contract, especially in light of Taylor's note to Tom Russell that they needed to discuss this particular unsolicited memorandum "ASAP," along with OAI's accompanying list of employees and staffing plan.  *See* O'Shea Dep. Ex. 13 (May 30, 2003 Email from Odoi-Atsem to Taylor); Pl.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 62-63.

Here, unlike in the case of the FOB-8 building, PM Services clearly had a tangible expectancy in the corporate opportunity presented by the 2003 Cohen & Switzer O&M contract.  While PM Services might have ultimately been denied that opportunity based on its prior performance under the 1998 Contract, *see* Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 49:10-20, that fact is irrelevant to the scope of O'Shea's fiduciary duty while at PM Services.  PM Services had defeated other companies through a competitive bid to obtain the 1998 Contract for the buildings, and had received numerous assurances by the GSA – while tentative and contingent – that it would also receive the 2003 Contract.  Accordingly, PM Services had more than a passing hope to receive the 2003 Contract:  it had a prior relationship with the GSA doing the work at issue in the buildings at issue; it had a history of maintaining contracts, including as a sole-source provider; and

it had been given indications that its effort to secure the 2003 Contract would prove fruitful.  As such, PM Services had a tangible expectancy in the 2003 Cohen & Switzer O&M contract.  While a genuine issue of fact remains concerning whether O'Shea diverted – or took efforts to divert – that contract to OAI while still employed by PM Services, if PM Services can establish that he did (which it cannot do on this disputed record), then it can establish a breach of the fiduciary duty of loyalty by O'Shea.   It is for the trier of fact to make credibility findings and resolve reasonable inferences.

4.   In Sum

In sum, the Court finds that a genuine issue of material fact remains as to whether O'Shea breached his fiduciary duty of loyalty to PM Services.  As such, both Plaintiff's and Defendants' Motions for Summary Judgment with respect to Count I of Plaintiff's Complaint must therefore be denied.  The issue of whether O'Shea (1) misappropriated confidential and/or proprietary information from PM Services or (2) solicited the GSA in such a manner that diverted and usurped PM Services' "corporate opportunities" with respect to RWA work, O&M work for the FOB-8 building, and the 2003 Cohen & Switzer O&M contract while still employed with PM Services in the Spring of 2003 remains an issue for resolution by the jury in this case.  However, no genuine issue of material fact remains with respect to PM Services' theory that O'Shea breached his duty of loyalty through solicitation leading to a "mass resignation" of the firm's employees; rather, the undisputed evidence undermines this claim.  Accordingly, PM Services shall be prohibited from presenting a "solicitation of employees" theory before the jury in any upcoming trial in this case.

B.   *Tortious Interference With Economic Advantage*

PM Services next claims that both O'Shea and OAI intentionally interfered with its advantageous business relationships when "OAI secured proprietary information from O'Shea as a

result of O'Shea's breach of fiduciary duty," Pl.'s Mot. for Summ. J. at 10, and then used the

information, including PM Services' "key and current employees" and "its selling points," "without

[the] solicitation of the GSA" to "interfere with PM Services['] business relationships to jump-start

[its] own O&M division," *id*. at 13.  In response, Defendants O'Shea and OAI contend that the

record simply does not support this accusation, as "[n]o evidence permits the conclusion that O'Shea

possessed any non-public or proprietary list and – particularly given the absence of a restrictive

covenant – O'Shea is entitled to work for OAI in competition with PM Services and to make

productive use of industry knowledge – including which vendors do a good job – gained while a PM

Services employee."  Defs.' Opp'n at 12.

"The tort of intentional interference with a prospective business advantage runs 'parallel to

that for interference with existing contracts.'" *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986)

(quoting W. Prosser, Law of Torts § 130, at 952 (4th ed. 1971) (footnote omitted); citing *DeKine v.*

*Dist. of Columbia*, 422 A.2d 981, 988 (D.C. 1980)).  As such, the United States Court of Appeals

for the District of Columbia Circuit has held that to establish a claim for tortious interference with

economic advantage under District of Columbia law, a plaintiff must show:  (1) the existence of a

valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the

part of the interferer; (3) intentional interference inducing or causing a breach or termination of the

relationship or expectancy; and (4) resultant damage.  *Bennett Enter., Inc. v. Domino's Pizza, Inc.*,

45 F.3d 493, 499 (D.C. Cir. 1995) (citing *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407,

422-23 (D.D.C. 1998); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284

(D.C. 1977)); *see also Furash*, 130 F. Supp. 2d at 55; *Sheppard v. Dickstein, Shapiro, Morin &*

*Oshinsky*, 59 F. Supp. 2d 27, 33-34 (D.D.C. 1999); *Mercer*, 920 F. Supp. at 239.  To survive a

motion to dismiss, "a plaintiff must allege 'business expectancies, not grounded in present

60

contractual relationships, but which are commercially reasonable to expect.'" *Sheppard*, 59 F.

Supp. 2d at 34 (citing *Democratic State Comm. of the Dist. of Columbia v. Bebchick*, 706 A.2d

569, 572 (D.C. 1998)).  "For the most part the 'expectancies' thus protected have been those of

future contractual relations, such as the prospect of obtaining employment or employees, or the

opportunity to obtain customers."  *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (citation omitted).

"Moreover, the defendants' interference must be improper."  *Mercer*, 920 F. Supp. at 239.

Indeed, "[c]ompetitive activity does not by itself constitute intentional interference with prospective

business advantage."  *Int'l City Mgmt. Ass'n Ret. Corp. v. Watkins*, 726 F. Supp. 1, 6 (D.D.C.

1998).  Rather, "[a]s its name would suggest, *intentional* interference requires an element of intent."

*Bennett Enter.*, 45 F.3d at 499 (emphasis in original).  "[A] general intent to interfere or knowledge

that conduct will injure the plaintiff's business dealings is insufficient to impose liability."  *Id.*

(quoting *Genetic Sys.*, 691 F. Supp. at 423).  As such, a plaintiff cannot establish liability without a

"'strong showing of intent' to disrupt ongoing business relationships."  *Id.* (quoting *Genetic Sys.*,

691 F. Supp. at 423).  "Motive or purpose to disrupt ongoing business relationships is of central

concern in a tortious interference case . . . . [C]onduct must be more egregious, for example, it must

involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement."  *Sheppard*, 59

F. Supp. 2d at 34 (quoting *Genetic Sys.*, 691 F. Supp. at 423); *see also Mercer*, 920 F. Supp. at

239 (requiring that the competitive activity be accomplished "by wrongful or improper means, such

as fraud") (quoting *Int'l City Mgmt. Ass'n*, 726 F. Supp. at 6; citing Restatement (Second) of Torts

§ 768 (same)).

PM Services can meet three (3) of the four (4) relevant *Bennett Enterprises* requirements

with relative ease.  As noted previously, the Court has concluded that PM Services has evidence to

support a "valid business expectancy" in the 2003 Cohen & Switzer O&M contract, while it remains

possible that it might have also had "valid business expectancies" in the RWA work targeted by

O'Shea for OAI and in O&M work for the FOB-8 building.  Given the fact that PM Services had

handled O&M work for the Cohen & Switzer buildings for the previous five (5) years, the 1998

Contract was a public record, PM Services was making efforts to obtain the 2003 Contract, and PM

Services had been given some assurances by the GSA that it might well be awarded that contract

(assurances of which O'Shea was aware), it can be assumed that Defendants had knowledge of the

relationship or expectancy.  PM Services was also clearly injured, as OAI was awarded the 2003

Contract despite PM Services' past relationship, present efforts, and the representations of GSA

officials.

The third prong – "intentional interference inducing or causing a breach or termination of

the relationship or expectancy," *Bennett Enter.*, 45 F.3d at 499 – is more complex.  As the

*Sheppard* court described, the conduct at issue must involve egregious conduct such as "libel,

slander, physical coercion, fraud, misrepresentation, or disparagement." *Sheppard*, 59 F. Supp. 2d

at 34 (quoting *Genetic Sys.*, 691 F. Supp. at 423).  Here, the only evidence supporting an

accusation that O'Shea somehow libeled, slandered, or disparaged PM Services is Teresa Simons'

August 1, 2003 memorandum, which states that O'Shea allegedly "said on numerous occasions,

that we could not even get supplies because [PM Services] did not pay their bills, and all their

accounts were closing."  Pl.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1.  PM

Services has no evidence independent of Simons' accusations that O'Shea ever disparaged PM

Services in any way, and both O'Shea and Taylor have denied PM Services' assertions in this

regard.  *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 85:6-14; *id.*, Ex. 9 (Taylor Dep.) at

44:10-22.  Moreover, even assuming the truth of Simons' accusations, her memorandum recounts

only that O'Shea disparaged PM Services to its employees at the Franconia Warehouse – it makes no reference to disparagement by O'Shea with respect to PM Services' current or prospective clients. As such, this accusation is insufficient to constitute intentional interference, as there is no causal link between the alleged disparagement and any loss of expectancy.

However, two alleged actions by Defendants might be sufficient – if proven – to meet the requirement of "egregious conduct" sufficient to establish intentional interference. First, as noted previously by the Court, a genuine issue of material fact remains as to whether Defendant O'Shea misappropriated PM Services' confidential and/or proprietary information, or breached his duty of loyalty to PM Services in other ways by knowingly and intentionally using his position and relationship to Taylor and others within the GSA to divert business opportunities away from his employer at the time to his prospective new venture with OAI. Use of this information by OAI to obtain the 2003 Cohen & Switzer contract would be sufficient to establish intentional interference with PM Services' business expectancy. Second, Odoi-Atsem's May 30, 2003 email to Scott Taylor representing that Defendant OAI had hired both O'Shea and Wehausen, along with OAI's corresponding brochure listing its employees and staffing plan, contained certain misrepresentations that – given their extent – might well constitute intentional interference as well.

In addition to "egregious conduct," the intentional interference prong also requires that the Defendants' actions induced or caused a breach or termination of the relationship or expectancy. Defendants focus on this requirement, and repeatedly stress that the GSA would have refused to award the 2003 Cohen & Switzer contract to PM Services based on its poor performance during the 1998 Contract, irrespective of the conduct of Defendants. *See supra* Section II(J)(2). However, a review of the record indicates that this argument arises wholly out of Scott Taylor's testimony, which is quite equivocal on this issue. *See* Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 49:10-

20.  Moreover, given the questions remaining regarding the type and extent of Defendants' conduct, the Court finds that it cannot conclusively determine – assuming the truth of Plaintiff's contentions in light of the evidence adduced – that Defendants did not induce or cause a termination of PM Services' expectancy in the 2003 Cohen & Switzer contract.  Rather, the Court concludes that a genuine issue of material fact remains as to the question of whether Defendants O'Shea and OAI intentionally interfered with PM Services' prospective economic advantage.  Given that the issue remains one for the jury to decide, Plaintiff's and Defendants' corresponding Motions for Summary Judgment must therefore be denied as to Count II of Plaintiff's Complaint.

C.      *O'Shea's Counterclaims*

Defendant O'Shea has brought two related counterclaims, which contend that (1) PM Services violated D.C. Code § 13-1303 when it failed to pay O'Shea's base and bonus wages during the leave period immediately prior to his resignation, and (2) PM Services violated O'Shea's pension rights when it failed to make payments and/or contributions due on his behalf, *see* O'Shea's Answer & Countercl. ¶¶ 21-23 (Count I - Violation of D.C. Code § 32-1303), ¶¶ 24-27 (Violation of Pension Rights).

With respect to O'Shea's first counterclaim, concerning his base and bonus wages, the Court finds that a genuine issue of material fact remains, and summary judgment must therefore be denied to both parties.  Two issues prevent the Court from awarding summary judgment.  First, with respect to his quarterly bonus, while O'Shea is correct that PM Services did not have a policy that required employees to be present in order to be entitled to payment of bonuses earned, *see* Defs.' Stmt. ¶ 40, PM Services is equally correct that O'Shea has failed to establish evidence that it had a *pro rata* policy with respect to bonuses, or that it had ever awarded a *pro rata* bonus previously.  Indeed, the evidence on record indicates that O'Shea was the only PM Services employee receiving a quarterly

64

bonus, and the question of whether an employee had to be "present" with the firm to receive such a

bonus had never been previously presented. *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at

248:19-254:7.  Given these divergent facts, the Court has no way of concluding whether or not

O'Shea was actually due his bonus.

Second, it is apparently uncontested that O'Shea was due vacation pay and wages from PM

Services through June 20, 2003; indeed,  Heather Metour orally promised to pay O'Shea these

wages in her answering machine message, *see* Defs.' Mot. for Summ. J., Ex. 20 (Recording of

Heather Metour's Phone Message for O'Shea) ("We are in receipt of your resignation letter and we

accept your resignation.  We are looking at the resignation as effective immediately.  We will pay

you through the 20th."), and Carole Metour admitted in deposition that O'Shea "should have been

paid vacation pay," *id.*, Ex. 1 (Metour Dep.) at 254:19-255:2.  *But see id.*, Ex. 1 (Metour Dep.) at

281:10-283:5 (Metour notes that there is a dispute between whether O'Shea would be owed thirty-

nine (39) hours of vacation pay, or only eighteen (18) vacation hours).  However, as PM Services

correctly asserts, the law is clear that "no compensation is owed an employee who has breached his

duty of loyalty" – indeed, the employer "is entitled to its return."  *See Riggs Inv. Mgmt. Corp.*, 966

F. Supp. at 1266 (citing *Radio TV Reports Inc. v. Ingersoll*, 742 F. Supp. 19, 23 (D.D.C. 1990)).

Given that substantial issues of material fact remain regarding whether O'Shea breached his

fiduciary duty of loyalty to PM Services, which could result in an offset to the wages due him, the

Court cannot grant summary judgment to either party with respect to this claim.  Accordingly,

Plaintiff's and Defendants' corresponding Motions for Summary Judgment must be denied with

respect to O'Shea's first counterclaim.

With respect to O'Shea's second counterclaim, which concerns an accusation that PM

Services violated O'Shea's pension rights when it failed to make payments and/or contributions due

on his behalf, the Court must also deny summary judgment.  With respect to this claim, O'Shea

contends that "PM Services failed to fulfill its obligations under the collective bargaining agreement

by failing to make a contribution to the IUOE's Health and Welfare Trust Fund for O'Shea's benefit

for the month of June 2003."  *see* O'Shea's Answer & Countercl. ¶ 20.  It is undisputed that PM

Services did not make contributions on O'Shea's behalf to the Central Pension Fund for the period

in question – stretching from June 4, 2003 to June 20, 2003 – despite the terms of the relevant

collective bargaining agreement.  *See* Defs.' Opp'n, Ex. 3 (Central Pension Funds Records) at 3.

However, given the connection of this counterclaim to O'Shea's first counterclaim, and the fact that

O'Shea's alleged actions might constitute a basis for PM Services to withhold these contributions as

an offset, it is clear that the extent and nature of PM Services' payment obligations vis-á-vis O'Shea

remains an open issue inappropriate for resolution at this time.

     D.    *PM Services' Damages Claim*

     PM Services' Complaint alleges that the company "has been damaged as a result of the

damage to its relationship, contract, and prospective contracts with GSA, its prospective economic

advantage with GSA, which damages include, but are not limited to, lost profits, the lost Cohen and

Switzer contract, injured customer goodwill, diminished value of its contracts, and loss of reputation

with its customers and potential customers, and other compensatory damages."  Compl. ¶¶ 36, 41.

To support a calculation of its damages theory, PM Services offered the expert report and deposition

testimony of Wilber G. Van Scoik.  In this case, given the existing material disputes as to liability,

the issue of the adequacy of Van Scoik's expert report would only arise if PM Services succeeded on

the merits of its liability claim, and then sought to establish damages.  However, Defendants, in their

Motion for Summary Judgment, essentially make a preemptive "motion to strike" the report by

contending that Van Scoik's expert report falls well below established industry standards and fails

the test established by *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  To support their claim, Defendants have attached a fifteen (15) page excerpt of Van Scoik's deposition to suggest that Van Scoik himself agreed that his work was limited, incomplete, without detailed analysis, and below his usual – and the industry's – standards. *See* Defs.' Reply at 11-15.  Plaintiff, in response, essentially evades the issue, failing to directly support Van Scoik's report and falling back instead on other theories of damages and excuses for the apparently incomplete nature of the report.  *See* Pl.'s Resp. ¶¶ 100-125; Pl.'s Opp'n at 10-11.

At the present time, the Court shall reserve on the question of whether to strike Van Scoik's expert report.  Instead, the Court shall require that Defendants present the Court with a full transcript of Van Scoik's testimony.  Upon review of that testimony, the Court shall determine (1) whether further briefing on the issue is necessary, and shall notify the parties if it decides accordingly; or (2) whether enough of a conflict exists for a *Daubert* hearing before any trial in this case, and shall notify the parties if it decides accordingly in order to schedule a hearing.

## IV: CONCLUSION

For the reasons set forth above, the Court shall deny both Plaintiff PM Services' Motion for Summary Judgment and Defendants' corresponding Motion for Summary Judgment in their entireties.  An Order accompanies this Memorandum Opinion.

Date:   January 4, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge